GOMBAULT *vs.* THE PUBLIC ADMINISTRATOR.

*In the matter of proving the last Will and Testament of* JAMES BACH, *deceased.*

ON the probate of a will, where the deceased leaves no known heirs or next of kin, the Public Administrator of the City of New York may intervene to contest the will in relation to the personal estate, and the Attorney General in relation to the real estate.

The decedent being deaf, and communication with him being ordinarily performed by writing on a slate and receiving his answers orally,—*Held*, that it was competent to perform the ceremonies of executing his will, in that mode. Under the circumstances, the reading and signing of the will, the affirmative response of the decedent to the question whether it was his will, followed by the signature of the witnesses in his immediate presence, constituted a valid testamentary act, involving a substantial rogation of the witnesses.

Where a disease, ultimately affecting the mind, was insidious and slow in its development, and there was ground for suspicion, that, previous to the *factum*, apprehensions were entertained of the possible approach of mental derangement, there should be a careful scrutiny of an act performed shortly before an accession of undoubted symptoms, in order to see whether it was a rational and natural act, conformable to the views and wishes of the party when in a state of health.

A will, made in a lucid interval, may be valid; but the facts establishing intelligent action must be shown. The nature and character of the instrument, and of its dispositions, have great influence in determining the mind of the court as to the capacity of the decedent at the time; and it is important to ascertain whether the contents of the will harmonize with the state of the decedent's affections and intentions otherwise expressed.

Where the contest is between the State claiming an escheat, on the one hand, and on the other parties standing towards the decedent in relations of intimate intercourse, confidence, and affection, and in whose favor he had expressed his testamentary intentions at various times antecedent, no presumption will be indulged against the validity of the instrument, except such as facts clearly proven compel the court to entertain. Mere suspicion will not overturn the disposition, and if there be discrepancies in the evidence, or doubts as to the preponderance of the testimony, the law inclines to sustain a reasonable and probable act.

GOMBAULT *vs.* THE PUBLIC ADMINISTRATOR.

NELSON MERRILL, *for Executors.*

The objections made to the probate of this will by the Attorney General, on behalf of the State, and by the Public Administrator on behalf of the City of New York, are:

First, Restraint.

Second, That undue influence was exercised over the testator, which caused him to make the will in favor of the devisees named in it.

Third, That the testator was of unsound mind when he made the will.

The reverse of these propositions is true.

By "restraint," in its legal signification as applied to wills, is meant any physical cause which obstructs or may materially prevent the free and full execution of the particular will of a person of sound mind.

It may be of two kinds. First, That which is entirely personal, and arises out of the testator's own physical incapacity, the result of his own unfortunate condition, irrespective of other persons and of outside influences or circumstances, as where he can neither speak, nor write, nor signify his wishes to such an extent of detail as would seem reasonable and necessary in view of the amount and condition of his property, the number and circumstances of his heirs, and any other probable objects of his reasonable bounty.

And Second, That which is caused entirely by other persons or outside influences, such as imprisonment, exclusion from free intercourse with other persons, or a denial of pen, ink, and paper, or of an amanuensis.

A man is restrained from making a will, though he has a sound mind, if he has not the requisite physical capacity to make known, in the prescribed way, what that mind is.

To have a sound understanding is of no avail, unless there is an outlet to it. It is equally restraint, whether the tongue and hand be held by palsy or padlock.

But neither of these two kinds of restraint existed in relation to Mr. Bach; for although, as the evidence shows, he

was totally deaf, and paralyzed so as to be unable to write, and weak, yet he could speak, and read, and see well, and converse by means of a slate, and thus he could make known to a writer the particulars of any will his mind might originate, and also to witnesses the declaration that it was his will, and the request to them to sign it as witnesses, as is required by the forms of the statute.

His personal physical condition was not tantamount to outside restraint.

Nor was there any outside restraint exercised over him, for all persons at all times had free access to him, as is proved.

There was no undue influence exercised over the testator to induce him to make his will in favor of the devisees. The evidence shows great delicacy and refinement in the conduct of the devisees towards the testator on the subject of making his will.

The testator was of sound mind when he made his will. This is the legal presumption, and there is a strong preponderance of evidence in favor of that fact. The next day he reverted to it, and recognized it, and told its contents to his physician, Dr. Storer.

The will is a reasonable one, and harmonizes with the testator's previously expressed intentions, and should be sustained as against the State and City, unless the court is compelled by the strongest evidence to repudiate it as void.

A. B. TAPPEN, *for Public Administrator and Attorney General.*

I. The statutory requirements were not complied with, in the execution of the will.

1. The testator did not publish the instrument as his last will and testament.

2. The testator did not request the subscribing witnesses to become such.

II. The testator was not competent to make a will.

1. His mind was impaired by age and bodily infirmities.

2. His testamentary capacity was affected by the disease under which he labored—" softening of the brain."

3. He was at times violently insane. ·

III. Undue influence was exercised over the testator by the legatees in obtaining the will.

1. One of the legatees had it drawn, without any proven directions from the testator.

2. The testator did not see the will until it was produced for his signature, and it was immediately taken from him.

3. The testator was treated throughout as though he were not competent to attend to his own affairs.

4. The person most active in procuring the drawing and execution of the will is named legatee therein, and there is no evidence of any prior testamentary intention of the testator in behalf of such legatee.

5. After the signing of the will, the testator gave tokens or evidence of having made the will under circumstances, the pressure or influence of which he was not at the time able to resist.

THE SURROGATE.—The decedent died in the City of New York, on the 31st day of October, 1856. On the 28th day of the preceding April, the will now presented for probate was executed by him at his residence in this city. The instrument devises and bequeaths all his property real and personal to Mrs. Margaret Gombault and Mrs. Sarah Monfort, two widow ladies with whom he had been residing for a number of years. It does not appear that the decedent left any known heirs or kindred, and the will has been contested by the Public Administrator, representing the City of New York, and in behalf of the Attorney General, representing the State of New York, as in case of an escheat in default of a valid testamentary provision.

The decedent was about sixty-eight or seventy years of age; his health had been declining some time before his decease,

and he had been mostly confined to his house, for about four months, in consequence of increasing debility, and the effects of a fall received in December, 1855. For several years he had been entirely deaf, and his friends ordinarily communicated with him by writing, his answers being given, and conversation continued, on his part, orally. He is represented as a person of great intelligence and acquirements, fond of discourse, and habituated to communicate readily with his associates in the mode I have described.

At the time of the execution of the will, the question was written on a slate, " Do you wish to make your will now ?" He nodded his head in approval. He then read the instrument, and again nodding approval, proceeded to sign it; he was then asked on the slate, " Is this your will ?" to which he signified assent, by nodding his head, and making some oral declarations, to which I shall hereafter particularly allude ; he requested two at least of the three subscribing witnesses to sign ; they subscribed the will in his immediate presence, and thus all the formal ceremonials were accomplished. Mr. Little, one of the witnesses, stated in his direct examination, that no one requested him to sign, but at a subsequent stage of the cause, he further testified, that the decedent had on several previous occasions stated his desire to make his will, and that Mr. Little should be present as a witness at the time—that he did not recollect that at the time of the execution, the decedent did not ask him to attest the paper, but from his familiarity with him he was more likely to intimate his wish by a sign or a nod, than by speaking, and that he did, in fact, motion to him to sign as a witness. Mrs. Thompson, one of the witnesses, states, however, quite distinctly, that the decedent requested both herself and Mr. Little to attest the instrument ; and I have no doubt the fact was so. The formalities were described in the attestation clause, and the parties had received the instructions and were acting under the supervision of a legal gentleman, who was within call at the time. The probabilities are, that the statutory forms were complied with ; but, independently of inference, we have

the positive statement of one of the witnesses, that the request was made in terms by the decedent. In default of this proof, however, I think that the reading and signing of the will and the accompanying declaration or response of Mr. Bach, to the question whether that was his will, followed by the signature of the witnesses under his immediate eye, constituted a valid testamentary act, involving a substantial rogation of the witnesses. I must therefore hold, that in point of form, the will was properly executed.

The next point for consideration is, to inquire whether the decedent had sufficient capacity to perform a testamentary act at the time of the execution of this instrument. It is alleged on the part of the contestants that he was generally incompetent, and especially at or about the period of the *celebration* of the will, was in a state of mental derangement. The first witness, chronologically speaking, adduced to testify on this point, was a policeman who accompanied the decedent to the hospital, at the time of his fall in December, 1855. The officer states, that as they rode in the carriage together, he asked Mr. Bach several questions; that he seemed confused, mumbled indistinctly, had a vacant stare, and gave no response to his inquiries. In view of the severe fall and consequent shock to his system, this conduct is not at all remarkable, and is by no means indicative of any permanent mental injury, while the failure to answer questions admits of the simple solution that he was totally deaf. From this period until about the month of April, there is no evidence tending to impeach the decedent's testamentary capacity. Mr. Ludlow states that in the spring he was employed to sell Mr. Bach's house, and the premises were put up at auction and bought in, the 14th or 15th of April. He also says that the sale was previously countermanded by Mrs. Monfort, who said, " that Mr. Bach might be incapacitated from transferring the property either by death or from want of mind, as he seemed at that time to be entirely out of his reason." Dennis Regan deposes that he was employed for a month by Mrs. Monfort to take care of the decedent—that he accom-

panied him several times when he went out, and on one of these occasions Mr. Bach fell and injured his arm severely. Regan says that some day after this, Mrs. Monfort came to the kitchen and said, " Dennis, Mr. Bach has willed his property to Mrs. Gombault and to me; and that next night she says, Dennis, you will go and take care of Mr. Bach; he is very poorly, indeed; take off your coat and put a white handkerchief around your head. I did as she told me, and went into his bedroom. Mr. Bach was in bed at that time, and Mrs. Gombault was in the room. Mr. Bach wanted to get out of bed; he shouted so loud, and says to me, Doctor, will you give me my pass out of here ? Mrs. Gombault was standing by, and he said to her, Are you the church ? if you are, he said, be merciful. I have paid a heavy sum to-day, he said; I have paid enough before, but I have paid a heavy sum today. This was the very day that Mrs. Monfort told me he had made his will." Mr. Keyser, the Godson of Mr. Bach, testified that he saw the decedent on two several days, between the 21st and 24th of April last. On the first occasion, the decedent recognized him, conversed a few minutes, and then broke off, and spoke irrationally, asking the witness " how much produce he had raised the last season for marketing." In the afternoon he appeared irritated, and said something to the witness about neglecting his business. On the next occasion, he did not notice Mr. Keyser, but sat in his chair, with his head down, picking at a sore on his arm, and muttering. The witness stayed at the house a week after this visit, but did not again see the decedent. Margaret Ford, who had been a servant with Mrs. Gombault for six years, and left her in the month of September last, states, that Mr. Bach took to his room in the month of April; she saw him throughout that month, daily, except four days, when he would not allow her to be in the room, because, he said, she was " crazy." She slept in his room every second night, " to hold Mr. Bach in bed." She says, " he would go round the room without clothing"—that she was told by the doctor to trip him up, when she could not otherwise manage him, and she adds, " I

mean by the word trip, knocking him down. I did knock him down a great many times. * * * I did not strike him, but took hold of him around his middle and threw him down." Independently of hearsay, and proof of various declarations by parties and witnesses, this is the substance of the direct evidence against the decedent's testamentary capacity.

In regard to Regan's testimony, it is observable, that, so far as his knowledge extended, he specifies but a single occasion during the whole month he was in the house, when anything indicative of mental disorder occurred in his presence. He says, this happened the night of the same day Mrs. Monfort communicated to him the fact that Mr. Bach had devised his property to her and her sister. He does not distinctly state that his informant said the will had been made that day; but if he meant so to be understood, it is certainly somewhat remarkable, if she entertained a belief that Mr. Bach was deranged, that the communicative beneficiary under the will, deeply interested in its validity, should have thus aided to expose its invalidity. The statements of Dr. Storer tend to show that there must be some error with this witness, as to time, if he designs to identify the day of the occurrence to which he has sworn, with the date of the will. If, however, he only means to say that it happened the same day he heard a will had been made, then the instrument may have been executed, for aught that appears, several days before, and the fact not have been made known until then. Regan does not recollect the date of his entering, nor the date of his leaving Mr. Bach's service, nor the date nor the day of the week he sat up with him. He says, however, that it happened after Mr. Bach was injured by the fall, and here I think may be a clue to the difficulty. After the fall Mr. Bach did not go out, and there was no longer need for Regan's services. Now he states that he left in the month of May, and Dr. Storer affirms distinctly that the fall happened on the fourth of May. Nay, more, Regan himself incidentally states, that Mr. Bach fell while taking a walk on Sunday; and the fourth of May, 1856, was Sunday. These circumstances all agree

naturally together, and lead the mind to the conclusion that the event to which he testified did not occur early enough to affect the question as to the *factum* of this will. The supposition that the fall happened on Sunday, the 27th, is not probable. Such an approximation to the date of the will, would naturally have impressed all the witnesses. Nor is it likely the doctor should have omitted a visit the day after the accident, and yet it appears that no visit was made the day the will was executed. Margaret Ford, however, states, that she recollects the night Regan sat up with Mr. Bach, and she heard the ladies speak of the will that day, "the same day it was said to be made." Neither of these witnesses, then, profess to have any knowledge of the date at which this instrument was executed, and the materiality of their testimony substantially depends upon recollection of conversation ten months ago, as to which, the slightest error would be important. Both of them allege that Dr. Storer declared the decedent to be "crazy," and both of them are contradicted by the doctor on this point. One of them, moreover, has stated a method of treatment of this old gentleman as sanctioned by the physician and the ladies with whom he had been domiciliated so many years, which excites our astonishment. She has given an account, also, of Mr. Bach's actions and deportment, which, so far as an affirmative can be refuted by negative testimony, is uncorroborated by any other witness. Not one out of the whole number sworn ever observed, on a single occasion, what she did so frequently; and her statement that the physician told her to trip the old man up "for fear he should choke" her, is distinctly and flatly denied by Dr. Storer.

The interviews stated by Mr. Keyser are placed by him between the 21st and 24th of April. It is urged, that, as he had just come from the country, the remarks of Mr. Bach at the first visit, in regard to produce, were not irrational; and that the decedent's deportment at the two succeeding interviews, was entirely consistent with the state of his feelings towards the visitor. Without entering into these considera-

tions, and giving the facts all the weight claimed for them, as tokens of irrationality five or six days before the will was made, we still must see what bearing they have in view of all the other circumstances proved in the case. In this connection I may allude to the testimony of Mr. Keyser and his wife, that Dr. Storer, about this same period, urged that Mr. Bach should be sent to the asylum, his malady having assumed the form of "craziness." The doctor puts this advice in a conditional form: that, "if" Mr. Bach "should prove so seriously ill, as to make it necessary he should go to the asylum," the certificate of another physician would be indispensable. Without attempting to reconcile these various statements, it is apparent that the case, thus far, calls for more extended investigation.

On the other hand, and in support of the will, the proof is as follows: Mr. Little, an old and intimate friend of the decedent, and one of the subscribing witnesses to the will, states, that at the time of the execution of the instrument, Mr. Bach was sitting up in his chair, shook hands with him, examined, and apparently read the will, with deliberation, and gave it his approval. He also says, that he had frequent interviews with the decedent, both before and after the 28th of April, in the course of which he communicated with him by writing on a slate, Mr. Bach reading what was written, aloud, and then commenting upon it, and conversing at length. Mr. Little declares, that at the time the will was made, he observed no difference as to the state of his mind, except what was naturally attendant upon the gradual failure of his bodily health, and likewise an apparent indisposition to talk. Indeed, he says very broadly, "up to the time of his death, I observed no signs of mental derangement." Mrs. Thompson, another of the subscribing witnesses, was acquainted with Mr. Bach, for two or three years, and saw him every day or two during his entire illness. She testifies that at the time of the *factum* of the will, Mr. Bach requested her to attest the document, and, after it was signed, expressed that "he was satisfied, and it was just as he wanted it;" that "his mind

was perfectly collected when the will was made," and she "had not observed any indication of aberration of mind, or insanity." Mary Alexandre watched with the decedent every other night, from some time in April until his decease; she states that he read the newspapers as late as the middle of May, and that he "was perfectly right" about the time of the execution of the will. Mr. Zimmerman sat up at night with the decedent in September, and shows that even then he was capable of expressing his wants; that he recognized his attendants, and exhibited no symptoms of a "wandering mind." Mr. Andrews had an interview with Mr. Bach, towards the close of May, but finding him just taking his chair preparatory to dinner, the conversation was brief. He says, "some remarks were made about the weather, and I think he inquired about my family; he seemed to know me; I was somewhat in a hurry; I don't think I discovered any aberration of mind. He was in more feeble health—weaker; I discovered no more aberration than I had done; he always spoke with me freely and correctly; I noticed no difference in that interview from others." * * * "I had seen him before, some time in April, I think, and from January to May several times. I think I saw him some time in April; I could not say definitely. We had the general conversation we usually had, about the general affairs of the day. * * * I esteemed him an intelligent man, and rather took pleasure in conversing with him. * * * I did not discover in April any unsoundness of mind." Mr. Sutherland, who drew the decedent's will, at the request of the legatees, testifies that about a week before the instrument was drafted, he dined with Mr. Bach in the parlor down stairs, and conversed with him at length; his answers "were very ready," and the witness thought he was "quite intelligent, discovered no incapacity." Mr. Ludlow called on Mr. Bach, at his residence, "not long after the attempt at sale," and conversed with him in relation to the property about twenty minutes, and found that he answered "intelligently." Dr. Putnam knew the decedent intimately for ten years. In the early part of March he had two interviews

with him relative to the sale of his house. He says he " appeared just as usual, excepting that he was weak—he had been sick." * * * " I wrote on the slate as usual, so that he sat and looked over and would answer before I completed the word, being accustomed to talk with me in that way." * * * " He appeared as usual, his mind seemed not quite so active, he did not seem to speak quite so quick; he appeared rational." We now come to the testimony of Dr. Storer, who was the attending physician of the decedent, during his entire illness, from the 29th of December down to his death. He states that Mr. Bach's illness commenced in December, from the effects of a fall, and that he had a second fall on the fourth of May. The disease of which he died was general prostration and chronic softening of the brain, or " general prostration of strength, ending in softening of the brain," indicated chiefly by the rational symptoms. The complaint did not develop itself until the last of May, or about June. " It did not altogether incapacitate him from transacting business; it did partially towards the latter part of his life." He showed occasional signs of excitement and derangement— " listlessness alternating with joyousness," and " he had at times, finally, mental delusion." There were " lucid intervals, sometimes as long as several weeks; lucid intervals occurred up to the time of his death," during which " his mind was entirely clear, and appeared to act normally." He went out as late as the 4th of May; after that was not confined to his bed, but could walk about, and go up and down stairs for some time. There were no " symptoms of mental aberration between December and the fall of the 4th of May," " no well-established symptoms, at all events," prior to the last date. The day previous to the execution of the will, " the condition of his mind was perfectly clear and lucid;" he " was then in his right mind, so as to understand what he was going to do." The day after he had made his will, he " was in his right mind, so as to understand what he had done." " His mind continued to be in the same lucid and clear state for several weeks after that. Along in the summer,

persons could converse with him intelligently by writing on the slate, which he always read;" "persons who came in, conversed with him during all the summer." He always recognized the doctor, and at his last visit repeated his name.

This testimony carries great weight. It shows, at the least, that parties who were in the habit of constant intercourse with the decedent observed no symptoms of incapacity actually existing, until after the *factum* of the will. Still the disease was insidious in its approach, and slow in its progress. The symptoms were more definite and marked in the later than in the earlier stages; but while in the course of their onward movement the shades of difference day by day were almost imperceptible, how shall we be able accurately to mark out the boundary line between a rational and an irrational condition, and to say, at this point the former ceased, and the latter began. This is always a great difficulty in cases of gradual development, and it leads to a careful scrutiny of an act performed shortly before the accession of undoubted symptoms, in order to see whether the act itself is conformable to the views of the party when in a state of health; whether it is natural, rational, and accordant with the wishes, affections, dispositions, and circumstances of the actor. I think, moreover, that there is ground for suspicion that some time in the month of April, apprehensions were entertained of the possible approach of mental derangement. But, if the symptoms giving rise to this apprehension were alarming, the proof tends to show that they relented, and that his faculties continued in a rational condition, perhaps with occasional changes, for a considerable period· after the execution of the will. Nor can there be any doubt that even after his disease became confirmed, Mr. Bach had lucid intervals. Among the most mysterious of the phenomena of the human mind, is the variation of the power and orderly action of the faculties, under different circumstances and conditions, and at different times; and especially mysterious is the oscillation from insanity to sanity, the rational power often fluctu-

ating to and fro, until reason ultimately settles down firmly upon her throne, or falls, never again to resume her place in this life. Without speculating upon this interesting theme, it is sufficient to say that the law recognizes the fact established by experience, and does not hesitate to ratify the validity of a transaction performed in a lucid interval; though it is exacting in its demands, and scrutinizing in its judgment, of facts adduced to exhibit and demonstrate intelligent action at the time of the event under investigation. The principle is thus stated in the Institutes, *Furiosi autem si per id tempus fecerint testamentum quo furor eorum intermissus est, jure testati esse videntur.* (*Quibus non est permissum facere testamentum, lib.* 2, *tit.* 12, § 1,) and it has been fully admitted in its broadest extent in the ecclesiastical courts. (*White* vs. *Driver*, 1 *Phill. R.*, 84; *Chambers* vs. *The Queen's Proctor*, 2 *Curteis*, 415.) There can be no doubt that during an intermission of the disease the testamentary capacity is restored.

Sir Willam Wynne remarks that "the strongest and best proof that can arise as to a lucid interval, is that which arises from the act itself; * * * if it can be proved and established that it is a rational act, rationally done, the whole thing is proved." (*Cartwright* vs. *Cartwright*, 1 *Phill. R.*, 90.) Without, however, acceding to the entire length and breadth of this view, it must be admitted that the nature and character of the act which is the subject of criticism, must have great influence in determining the mind of the court in its judgment of the case. It is also worthy of remark, that a lucid interval is more easily established in cases of delirium, or fluctuations arising from temporary excitement, or from periodicity in the attacks of the disease, than in cases of habitual insanity. In *Coghlan* vs. *Coghlan*, (1 *Phill. R.*, 90,) the deceased was proved to have been completely insane before the will was thought of. The instructions for drawing the instrument were given in a composed manner, there appeared to be no disease at the time, and the will being reasonable and consistent with his intentions when his mind

was clear, was admitted to probate. In *Chambers* vs. *The Queen's Proctor*, the decedent committed suicide the day after he had executed his will. There had been indications of insanity about a year before, and for three days preceding the *factum*, the deceased had been laboring under insane delusions. Sir Herbert Jenner said " what is the court to do, in order to see whether the act of the deceased is a valid act? It must look to the manner in which the act was done, to satisfy itself whether a lucid interval is established. It cannot be contended that the delusion was fixed and of long duration; and if done during a lucid interval, the act will be valid, notwithstanding *previous and subsequent insanity.*" The learned judge gave sentence for the will, mainly on the ground of the reasonable dispositions contained in the instrument, the absence of proof of delusion at the time of the *factum*, and the rational manner in which the act was performed.

In the present case, giving the evidence of the witnesses for the contestants all the weight claimed, keeping in mind, however, the uncertainty as to the precise time of the occurrences, except the instances proved by Mr. Keyser, we have proof of capacity shortly before, and capacity for some time after; besides the absence of any irrational signs at the time of the celebration of the will. Dr. Storer is explicit in his statement that delusions were evinced only during the later stages of the disease, and it is obvious, generally speaking, that the earlier symptoms of the case indicated a torpid rather than irregular or abnormal mental action—inertness rather than aberration.

After a careful consideration of all the evidence, duly comparing and weighing the whole, I am satisfied there were periods after the accession of the disease, and even for weeks after the date of this will, when the decedent had the requisite degree of capacity for the celebration of a valid testament. But in view of all the circumstances and proofs, the apprehension existing as to the probable nature of his disease, and the preparation of the paper by the parties benefited by its provisions, I am bound to proceed with caution and circum-

spection, and particularly, to inquire whether the contents of the instrument harmonize with the state of the decedent's affections and intentions.    On this point the evidence is clear and satisfactory; for although he may previously have been interested in his Godson, his testamentary intentions, whenever expressed, appear uniformly directed to another quarter; and notwithstanding the will was prepared by the legatees, origination and recognition are shown on the part of the decedent.

Mr. Little says, " he did nothing more in the will, than what he always told me he intended to do; * * * he told me he intended to give the ladies all he had; he spoke particularly of Mrs. Gombault; he said they were the only ones to receive it; * * * it was a matter always introduced by himself."    Mr. Benjamin Merritt testified that in the spring of 1854, Mr. Bach was desirous of purchasing a house, and stated to him in that connection, that " he wanted to buy a house for Mrs. Gombault."    Mr. William H. Merritt, who was on intimate terms with Mr. Bach, deposed, that in the year 1854, he had several confidential conversations with him relative to the purchase of a house " for his own residence as well as that of Mrs. Gombault and Mrs. Monfort;" * * * " he stated that his relations with Mr. Gombault had been of the most intimate character, associated with him in business; that on some particular occasion previous to his death, at which time he was embarrassed pecuniarily and felt considerable anxiety for his widow, Mr. Gombault anticipating his death, Mr. Bach promised him, ' with all the importance to my mind,' Mr. Bach so expressed it, ' of a death-bed promise,' that he would provide for Mrs. Gombault." * * * " The words I have given were his precise words, and they were very emphatic."    Mr. Tillinghast also testified to a conversation with the decedent about the same period, in respect to the purchase of a residence, in the course of which he stated that " he had once been in business with Mr. Gombault, and promised him at his death, that he would provide for Mrs. Gombault, or see that she was taken care of."    Mrs. Thompson says, that within

three months prior to the execution of the will, she heard Mr. Bach say, " he wished to have his will made, and wished to have it made in favor of these ladies, Mrs. Gombault and Mrs. Monfort," * * * " that he had always intended Mrs. Gombault and Mrs. Monfort should have what he had to leave." Mary Alexandre, the nurse who sat up with Mr. Bach alternate nights, testifies that he frequently expressed the wish that " Mrs. Monfort would do what he had requested her to do," that he desired to " have his will made ;" and on the morning of the 28th of April, when Mrs. Monfort came to his room to inquire how he was, " he said he wished to have somebody come to draw his will ; he wished to leave everything he had" to these two ladies. Mrs. Thompson says that " at the time he signed the will he said it was made in favor of the ladies—that he had always intended Mrs. Gombault and Mrs. Monfort should have what he had to leave." And finally, Dr. Storer gives this statement : " I saw him the morning of the day after he had made his will. His condition of mind was a very cheerful one. On entering the room, he was sitting up in bed, and raising his hand, he said, ' Ah ! Doctor, I am very happy to see you this morning ;' he said, ' I have done what I have long wished to do ; I have made my will in behalf of Mrs. Gombault and Mrs. Monfort, my dear friends, who have always exhibited such tender care for me.'" This is distinct and emphatic, and corroborates the will by testimony confluent to the same point, from independent sources. Though one of the sisters originally possessed a stronger claim to his bounty than the other, yet he had long been domesticated with both ; they had all lived under the same roof, sat by the same fireside, and constituted one family together. Three witnesses speak also to declarations relating to both the legatees jointly, and I can have no doubt upon the evidence that it was his intent each should share in his estate. The heart naturally centres at home, and the affections ever exercise a potent influence in directing the disposition of property, where there are no counterbalancing claims upon the justice or the liberality of the benefactor. We look in

GOMBAULT *vs.* THE PUBLIC ADMINISTRATOR.

vain for any proofs in this cause showing expressed testamentary declarations in favor of any other party. And finally, the statement made by the decedent the morning after the date of the will, is especially striking, as an intelligent exhibition of the transaction, and a touching exposition of the motive which animated it. Is this statement to be doubted? and, if true, can there be hesitation in sustaining the act which this old man rejoiced so much in announcing to his friend and physician?

In the first place, then, after this review of the testimony, whatever may be the proof on other points, we have the doctor's evidence, clear, distinct, and definite, to this effect— that he was of sound mind the day preceding and the day succeeding the execution of the will. The fact that medical visits were then made only on alternate days, is repugnant to the idea that any alarming symptoms were present at that time. A witness testifies that on the morning of the 28th of April, the decedent requested Mrs. Monfort to attend to the matter of his will; when the instrument is subsequently presented, the ceremony is performed rationally; he examines the paper, declares it to be satisfactory, and describes it as devising his estate to the two beneficiaries; a night intervenes, and he salutes his physician in the morning with the expression of his pleasure that he had accomplished a chosen purpose, and again exhibits an intelligent comprehension of the nature and special effect of the act. In the next place, after full examination, the contents of the will appear to be in harmony with his previous declarations. Years before, he had promised an old associate and friend, whose mind, in view of approaching death, was filled with apprehensions for the fate of his wife, that he would provide for her. He had kept his pledge for many years, and when such voluntary obligations too often press more lightly upon the conscience than they do when life is drawing to a close; he had continued steadfast to his self-assumed duty, had extended his benefactions to the sister of his deceased friend's widow, and, for a long period, they had all abode under the same roof as

brother and sisters. They tended his declining years with assiduous care, and he, mindful of the death-bed promise, sacredly observed its solemn obligations in one of the last formal acts of his life. There are no kindred intervening against this disposition, no persons of the decedent's blood who have been disappointed in expectations of a natural succession; but the controversy is between the State, claiming an escheat of his property, on the one hand, and, on the other, parties standing towards him in relations of intimate intercourse, confidence, and affection, and in whose favor he had expressed his testamentary intentions at various times antecedent. Under such circumstances, no presumption will be indulged against the validity of the instrument, except such as facts clearly proven compel the court to entertain. Mere suspicion will not overturn the disposition, and if there be discrepancies in the evidence, or doubts as to the preponderance of the testimony, the law inclines to sustain a reasonable and probable act. There is a general presumption, also, in favor of capacity, which must be satisfactorily disproved, when no grounds exist for imputing fraud or circumvention, and the contents of the instrument in question are natural and rational. It is proved that this was a reasonable act; it appears to have been rationally performed; and I have no doubt it is my duty to pronounce sentence of probate. There must be a decree accordingly.