W. B. Denson v. Mary H. Beazley.

1. In this case, which was a contested probate of a will, the court considers and discusses the tests by which is to be determined the degree of mental capacity necessary to the execution of a will, and whether the testator in the present case was or was not possessed of testamentary capacity at the date of the will in question. The majority of the court (Presiding Judge Evans dissenting) conclude that the evidence does not suffice to establish a want of capacity in the testator, and that the instructions of the court below to the jury were erroneous, and were calculated to mislead the jury, who found against the validity of the will.

2. The court below instructed the jury, in substance, that insanity or unsoundness of mind is that mental condition which exists when common sense and reason are destroyed or greatly impaired, and delusion exists. *Held*, that this definition of insanity is sophistical and erroneous, being calculated to mislead the jury into regarding insanity and delusion as the same thing, or as indicative of the same condition of mind. (Presiding Judge Evans dissents, in view of the entire charge given by the court below.)

3. Peculiar opinions, or what are commonly called delusions, may be entertained by a testator on certain subjects, and his will may appear unjust to his surviving relatives, and may even display some of the extraordinary opinions entertained by him, and yet the will be valid, when the testamentary dispositions do not indicate that they were formed under a

XXXIV—12

delusion. But in this case the majority of the court (Presiding Judge Evans dissenting) deem the evidence insufficient to demonstrate delusion in the mind of the testator.

4. The verdict returned was as follows : " We, the jury, agree that the will of June, 1868, is invalid." The majority of the court would not vacate this verdict on account of its informality alone ; but they regard it with some suspicion, in consequence of its failure to refer or allude to the evidence in the cause as the predicate on which it was founded. Presiding Judge Evans, regarding the merits of the case as having been attained by the verdict and judgment against the will, does not comment upon the form of the verdict.

5. Presiding Judge Evans, dissenting from the conclusions of the majority of the court, recapitulates such of the evidence as he deems important and reviews the authorities relative to the questions of medical jurisprudence involved in the case ; arriving at the conclusion that the mind of the testator was much impaired by disease and senility, and that his will, which gavé the bulk of his estate to a stranger, was the offspring of undue influence exerted by the latter upon the mind of the testator. The Presiding Judge holds that sufficient capacity to sustain the will might have been inferred, if its provisions had been natural, just and considerate ; but that, inasmuch as they were unreasonable, unjust to the testator's relatives, and in favor of a party having no natural claims upon him, and who had availed himself of opportunities to influence his mind and thus secure the will in his own favor, the inference of testamentary incapacity and of undue influence should be deduced, and the judgment of the court below be sustained.

Appeal from Polk. Tried below before the Hon. H. C. Pedigo.

This case presents the record of a contest in the district court respecting the validity of two wills, executed by Hamilton Washington, the testator, one purporting to have been executed on the nineteenth of May, 1860, and leaving his entire estate to his sister, Mrs. Mary H. Beazley, and the other executed on the sixth of June, 1868, by which he bequeathed pretty much all of his estate to Wm. B. Denson, the appellant. At the date of this last will, the testator was in his last illness, of which he died on the thirtieth day of the same month, aged about sixty-five years. Denson

was no relative of the testator.    The dissenting · opinion of Pre-
.siding Judge Evans states the testimony respecting the considera-
tions which moved the testator to make this will in his favor.

This cause had its inception in the county court for the settle-
ment of estates, before the merger of that tribunal into the
district courts by the Constitution of 1869.    At the August term,
1868, of that court, F. M. Sansom and D. M. Mitchell, named
as executors of the will of 1868, presented that instrument for
probate.    At the same term, Mrs. Beazley, who was named as
executrix as well as sole legatee of the will of 1860, appeared and
filed a counter-application, praying for the probate of the latter
instrument as the last will of the testator.    She denied the testa-
mentary capacity of the deceased at the date of the will of June
6, 1868, and alleged that it was obtained by undue influence and
fraud.

Pending the proceedings in the probate court, Sansom, one of
the executors named in the will of 1868, renounced the execu-
torship, and on the fifth of September, 1868, that court adjudged
that will to be invalid, and established the will of 1860, as the
last will and testament of Hamilton Washington, deceased.
From this judgment Denson appealed to the district court of
Polk county, where there was a trial of the case by a jury at the
October term, 1870, resulting in a verdict that the will of 1868
was invalid, and in a judgment to the same effect and establishing
the will of 1860.

The transcript brought up to this court comprises nearly four
hundred pages, almost all of which are engrossed in the statement
of the facts, consisting of numerous depositions and much docu-
mentary evidence.    It is impossible, on the one hand, to insert all
this matter, while, upon the other, selections from · it or an at-
tempted synopsis of it will probably result · in the omission of
much deemed important by the · parties to a fair presentment of
their respective cases.

Both of the wills in question were wholly written by the testator himself, except the codicil to the last one, which was written by F. M. Sansom at his request. The first one, dated in 1860, gave his entire estate to Mrs. Beazley, his sister, but requested her to allow certain Indians, whom he had settled upon his lands, to remain there so long as they conducted themselves well. The questions controverted in the cause arose, however, upon the will of 1868, which was in the following terms:

"I make this my last will and testament, revoking all others. It is my will that the two notes, for $2000 each, and the twelve notes for $1000 each, given me by Col. William B. Denson, shall be applied to the payment of my just debts, paying first a note given to Judge John T. Smith, of Houston county, Texas, and my note for $1600, held by Wm. M. Goodrich, of New Orleans and New York, both of which debts it is my will shall be paid in coin. And after the payment of debts I bequeath to said Col. Wm. B. Denson all the remainder of said notes, and instruct my executors to deliver the said notes to him, to be canceled so soon as my debts shall have been paid. This bequest is made in consequence of losses and failures of crops, incurred since he made the purchase, and also on account of kindness and attention received from himself and his family. All other property, real and personal, of which I die possessed, I bequeath to my sister, Mrs. Mary H. Beazley, for her sole and separate use.

"I appoint Francis M. Sansom and Douglas M. Mitchel, both of Polk county, Texas, executors of this my last will and testament.

"Witness my hand and scroll for seal, this sixth day of June, 1868.

"H. WASHINGTON. [L. S.]

"Witness: F. M. SANSOM.

"RICHARD COLE."

The following is the codicil to the will:

" I make this codicil to my last will and testament, bearing date of the sixth of this instant, 1868 : I instruct my executors under no circumstances to press W. B. Denson so long as he complies with the conditions of the sale, by working the plantation, and paying the portion of crops agreed upon. I also beg of the creditors on their own account, as well as Col. Denson, not to press or harass him, so long as he works the plantation and pays over the portion of the crops for which he has given a lien.

" Witness my hand and scroll for seal, this the eighth day of June, 1868.

"H. WASHINGTON. [L. S.]

" Witness: F. M. SANSOM.

"RICHARD COLE."

Both of the subscribing witnesses, Sansom and Cole, considered the testator in full possession of his faculties on the sixth and eighth of June, when the last will and the codicil were executed. They narrated many details of the circumstances attendant upon the transaction. Cole was the brother-in-law of Denson, and no one besides the testator, the subscribing witnesses, and Denson, were present when the will and codicil were executed.

Charles Floyd, another witness, had lived in the same family with the testator for five or six months before the death of the latter, and conversed with him several times a day during that period. The witness was in the testator's room on the sixth of June, 1868, and heard the testator dictating a deed to Denson. Witness always considered the testator of sound mind, and saw nothing to make him change that opinion.

H. W. Augustine knew the testator for eight or nine years before his death, and their intercourse for most of that time was frequent, and they discussed many different subjects and had divers business transactions. Witness last saw the testator in May, 1868, about fifteen or twenty days before the latter was taken sick. They then had a long conversation, in the course of which they

discussed the sale made by the testator to Denson. The witness gave the particulars of the interview, and stated that he never saw an act or heard an expression of the testator which indicated unsoundness of mind.

Kirkland Augustine sat up one night with the testator, four or five days before the death of the latter. They had some conversation together. The deceased seemed to understand witness, and witness understood him. From witness's knowledge of the habits, manners, and conversation of the testator, witness believed him to have been of sound mind down to the time of his death.

John T. Smith, of Houston county, had known the testator for ten or fifteen years, and had had business transactions with him during the years of 1863, 1864, 1865, and 1866, during which period he was frequently at witness's house. During the war the testator was superintendant of government works in Houston and Anderson counties, for the purpose of building flat boats to carry supplies to the troops at Galveston. Witness had met him elsewhere on several occasions, and had had considerable correspondence with him. In 1866, witness loaned him three thousand dollars in currency, and took his note for the gold equivalent, amounting to some twenty-one or two hundred dollars, with a mortgage on his plantation in Polk county as security. Witness saw him many times afterwards, until shortly before his death, and as to any unsoundness of his mind witness never thought of such a thing, nor ever heard mention of it until after his death. This witness appended to his deposition some eight letters, addressed to him by the testator at various dates from August 24, 1866, to June 21, 1868, a few days before the death of the latter. These letters related to the loan of money above referred to. They strongly indicate a highly cultivated mind, and as highly honorable a heart. The later ones denote much sensitiveness in consequence of his inability to repay the loan in accordance with his contract, and great solicitude to secure and satisfy his creditor, who, so far as appears, was not pressing him for payment.

Dr. Wm. R. Smith, of Galveston, had known the testator some fifteen years, and during 1866, 1867, and 1868, had had much correspondence with him, relative, for the most part, to extensive and valuable lands in Bell county, entrusted by witness to the testator for the purpose of clearing out the titles, obtaining possession, etc. In the course of witness's long acquaintance with the testator, and especially during the years 1866, 1867, and 1868, witness knew of no act or deed on the part of the testator suggestive for a moment of any alienation or unsoundness of mind, and no intimation of that kind had ever reached witness during his acquaintance with the testator. Witness's opportunities of forming a correct opinion on this subject were afforded by the testator's visits to Galveston, and the personal interviews and correspondence which had transpired between them. Twelve letters from the testator to the witness, of various dates from August 6, 1866, to May 29, 1868, occupy nearly forty pages of the transcript in detailing information and submitting suggestions in relation to the landed interests referred to.

W. M. Goodrich, of Poughkeepsie, New York, had for twenty years known and esteemed the testator as one of his best friends. In 1866, witness had spent two weeks at the testator's house in Polk county, and had daily conversations and social intercourse with him. The testator assisted witness in arranging the latter's business with occupants of his lands. Witness found all of the testator's advice to be wise and judicious, and knew of no single act or expression indicative of anything but a sound and vigorous mind. During many years, and down to about three and a half months before the death of the testator, a constant correspondence had been maintained between him and this witness.

The foregoing is of course but a meagre outline of the testimony relied upon by the appellant in support of the will of 1868. The witnesses gave lengthy details of circumstances, conversations, business transactions, etc., for the purpose of showing their

opportunities or fortifying their views—a recapitulation of all which would require a large part, if not all, of this volume.

Many witnesses and much testimony were introduced in behalf of the appellee, and in opposition to the will of 1868, for the purpose of showing alienation of mind on the part of the testator, and undue influence over him by Denson. The able dissenting opinion of Chief Justice Evans collates the most important of this evidence, and relieves the reporter from a repetition of it. The witnesses, however, state many matters of detail which they regarded as evidence of mental aberration, and which are not set forth in the dissenting opinion; but in view of the grounds on which the case is disposed of by the court, the reporter would scarcely be justified in consuming so much space as their insertion would require.

The jury returned a verdict against the will of 1868, and in a form which will be found in the head notes.

Counsel on both sides of this cause presented it to the court in briefs of marked ability, discussing both the facts and the law. But these briefs, of necessity, were protracted and elaborated to a degree proportionate to the record, and while their length precludes an insertion of them in full, they are, nevertheless, so condensed that no mere abstract of them would be either useful or satisfactory.

*W. M. Walton* and *Hancock & West*, for the appellant.

*S. P. Donley* and *John L. Henry*, for the appellee.

WALKER, J.—This was a proceeding originating in the Probate Court of Polk County, on application to probate a will of Hamilton Washington, dated June 6, 1868, to which was attached a codicil bearing the same date. To the probate of this will, Mrs. Mary H. Beazley, who was the sister of the testator, filed exceptions, and offered to probate a will of Hamilton Washington, dated

May 19, 1860.    Such proceedings were herein had as have brought this case to us on appeal from the district court.

The case has been very ably argued before us, both upon the law and the facts. · Several grounds of error are assigned.    It is claimed that the charge of the court is erroneous, and misled the jury; that the verdict of the jury is not in legal form, nor substantially sufficient in law; and that it is contrary to the evidence.

We shall remark upon the first and second assignments.    In the charge of the court is contained this passage :    "Insanity or unsoundness of mind is that condition in which the mind is left when common sense and reason are destroyed or greatly impaired, and delusion exists.    These delusions, which are the ordinary accompaniments, are evidences of insanity, and are extravagant or impossible things which do not exist at all, except in the imagination of the insane person, but which he cannot be· persuaded or convinced do not exist.    The true test of the absence or presence of insanity·is the absence or presence of these delusions."

This is simply learned sophistry.    If insanity or unsoundness of mind is that condition of mind which exists when common sense and reason are greatly impaired, and delusion exists, then when delusion exists the mind is unsound, insane and destroyed.    If the true test of the absence or presence of insanity is· the absence or presence of delusion, then insanity and delusion become the same thing; or at least are no more than different terms used to designate the same condition of mind.    Tried by such a metaphysical or psychological test, Emanuel Swedenborg, John Wesley, Martin Luther, Joan of Arc, Joseph Addison, and the author of Rasselas, Napoleon Bonaparte, and hundreds more of the greatest and soundest minds which ever existed on earth, must be declared insane.    For each of these stoutly maintained what men of the present day would declare delusions.    Indeed, delusion is so common that if the whole human family were tried by an infallible standard, there would be very few who could maintain absolute san-

ity; and it is not improbable that the very few would be among the most assinine specimens of humanity. People do not now maintain a belief in visions, supernatural visitations, witches nor apparitions. They do not throw inkstands at the devil, nor do they believe that a vagrant palmist could foretell the fortunes of a creole girl, who, becoming the wife of one of the greatest men who ever lived on earth, thereby controlled his destiny.

But, in this age of science and metaphysical learning, it may be that a man of science might maintain that there was a certain amount of poison contained in the Irish potato, at a certain period of its growth; enough to affect the human stomach, if taken in too great a quantity; that a line of fascines, sunk in the bottom of a river which was changing its bottom by the washing sands, and altering its bed by the lodgment of drift, might be made to obstruct the navigation of a stream; that a drove of wild hogs, if confined in a field, and driven about from day to day, might become familiar to the presence of the driver, and be rendered tractable; that Indians were human beings on whom the attributes of kindness, mercy and charity might not be wasted. We say it might be possible that such theories and speculations might be called delusions, and yet be no evidence of an unsound mind.

Diogenes might live in his tub and hunt the streets of Athens at midnight for a *Vir.* Had he hunted a *Homo* or an *Anthropos*, he might easily have found one; and if this had been properly understood, the eccentricity of the philosopher would have been understood as sound sense, conveyed under a most withering sarcasm against the frivolity of the Athenians. We think Diogenes had sufficient reason to have made a good will. Alexander evidently thought him a man of sense, for he said: "If I were not Alexander, I should wish to be Diogenes." Perhaps he might have sunk the Alexander, and yet lost nothing by becoming the Diogenes.

Fortunately the rules of law have become so well settled in

matters of this kind that we are not left to speculation or conjecture. We will proceed to give such authorities as must render the rule a plain one. (See Redfield on the Law of Wills, part 1, 78, 79, 80, 81, 82, 83, 84, 85, 87, 88, 89, 90.)

" Whenever it appears that the will is the direct offspring of the partial insanity or monomania under which the testator was laboring, it should be regarded as invalid, though his general capacity be unimpeached. (Potts v. House, 6 Ga., 324; Townsend v. Townsend, 7 Gill., 10.) This point is very happily illustrated by Mr. Justice Sergeant, Boyd v. Eby, 8 Watts, 71. (See, also, Leech v. Leech, 11 Penn. Law. J., 179.)

" A somewhat remarkable opinion was delivered by Lord Brougham in an important case before the Privy Council, in which he takes the ground that any person laboring under delusion or monomania, to any extent or upon any subject, is not to be regarded as competent to execute a valid will. (See Waring v. Waring, 6 Moore, P. C. Cases, 349; S. C. 12 Jur., 947.) We have no apprehension that any such rule will permanently obtain currency in the English courts. It has certainly received no countenance in this country, and we should not be surprised if this opinion were never alluded to in the cases which shall hereafter occur in the English courts.

" The most remarkable case of mere eccentricity upon record, if it was such, is that of Morgan v. Boys, (see Taylor's Med. Jour., 657, 1838,) where the will was upheld on the ground that there was no satisfactory proof of actual unsoundness of mind. The testator devised his property to a stranger, thus wholly disinheriting the heir or next of kin, and directed that his executors should cause some parts of his bowels to be converted into fiddle-strings, that others should be sublimed into smelling salts, and that the remainder of his body should be vitrified into lenses for optical purposes. In a letter attached to the will the testator said : ' The world may think this to be done in a spirit of singu-

larity or whim, but I have a mortal aversion to funeral pomp, and I wish my body to be converted into purposes useful to mankind.' The testator was shown to have conducted affairs with great shrewdness and ability; that so far from being imbecile he had always been regarded by his associates through life as a person of indisputable capacity. Sir Herbert Jenner Faust regarded the proof as not sufficient to establish insanity, it amounting to nothing more than eccentricity in his judgment. In another case, where the probate of will was resisted on the ground of insanity, and defended on plea of eccentricity, (see Mudway v. Croft, 3 Curtis, 678; Taylor, 658,) Sir H. J. Faust said: 'It is the prolonged departure, without an adequate external cause, from the state of feeling and modes of thinking usual to the individual when in health, that is the true feature of disorder of the mind.' And in another case, where the will was declared invalid by the Prerogative Court of Canterbury, (see Austin v. Graham, 29 Eng. L. and Eq., 38,) the decree was reversed on appeal by the judicial committee of the privy council. The testator was a native of England, but had lived in the East, and was familiar with eastern habits and superstitions, and professed his belief in the Mahometan religion. He died in England, leaving a will which, after various legacies, gave the residue to the poor of Constantinople, and also toward erecting a cenotaph in that city inscribed with his name and bearing a light continually burning therein. The prerogative court pronounced the testator to be unsound of mind, principally upon the ground of this extraordinary bequest, which sounded to folly, together with the wild and extravagant language of the testator, proved by parol. But on appeal it was held that, as the insanity attributed to the testator was not monomania, but general insanity or mental derangement, the proper mode of testing its existence was to review the life, habits and opinions of the testator, and on such a review there was nothing absurd or unnatural in the bequest, or anything in his conduct, at

the date of the will, indicating derangement, and it was therefore admitted to probate.

"A will may be manifestly unjust to the surviving relatives of a testator, and it may display some of the extraordinary opinions of the individual, yet it will not necessarily be void, unless the testamentary dispositions *clearly indicate that they have been formed under a delusion.*

"In Tennessee it was held that a person who believed, in reference to a future state of existence, that there were degrees of happiness there, and that in whatever circle a man lived on earth he would move in the same sphere in future life; and that his pre-eminence there depended materially upon the amount of property he acquired here, and the charitable purposes to which he might have appropriated it—might make his will; and such opinions were no evidence of insanity. (See Gass v. Gass, 3 Humph., 278.) 'There is proof in the record' said the learned judge, 'tending to show that the testator held opinions somewhat peculiar in relation to futurity, to-wit: that there was degree in heaven; that whatever circle of life a man lived in on this earth would be enjoyed by him in heaven; that the pre-eminence there depended materially upon the amount of property he acquired here, and the charitable purposes to which he might have appropriated it.' This, it is contended, is delusion, and the court was asked to charge that it was evidence of insanity sufficient to avoid the will.

"If, then, delusion be insanity, to charge that the proof established delusion would be to charge that the insanity is proven—the question of fact to be determined; but the court was asked to charge that it was evidence of insanity sufficient to avoid the will. The points of belief avowed by the testator are expressions of opinion, which opinion is either a delusion or not; if it be a delusion it is direct insanity; if it be no delusion, there is no insanity, and of course it cannot be evidence of it. But who shall say that the opinion avowed by the testator, as to futurity, is a delusion. De-

lusion is defined to be, when a patient conceives something extravagant to exist which has no existence but in his own heated imagination, and having so conceived it, is incapable of being reasoned out of the conception (Shelford on Lunacy, 40); as the fancying things to exist which can have no existence, and are impossible, according to the nature of things, as that trees walk (Shelford, 293); the magnifying slight circumstances beyond all reasonable bounds, as if the parent of a child, really blameable to certain extent in some particulars, takes occasion to fancy her a fiend, a monster, an incarnate devil (Shelford, 41.)  We can comprehend the delusion of the man who fancied he was Jesus Christ, and kindly extended his forgiveness when asked, saying 'I am the Christ;' also his who imagined he corresponded with a princess in cherry juice, and his who dreamed dreams and heard voices directing him to burn York Minster Church.  But we cannot comprehend a delusion upon a point of belief as to the nature of future rewards and punishments, and the principles of justice upon which they will be distributed.  This is a subject beyond the ken of mortal man, and in one sense of the word perhaps every individual is laboring under a delusion who attempts to solve it.  Yet there is no subject we are more disposed to theorize about, and about which there is a greater conflict of opinion.  The fool hath said in his heart there is no God, and of course no future rewards and punishments; a dreadful error, yet no one apprehends that it amounts to insanity, and that he has not a disposing mind.

" The Turk looks to his heaven of sensual enjoyment, the Christian to his intellectual points of faith, differing as widely as the sources of their religion.  Delusion in its legal sense cannot be predicated of either, and indeed of no creed upon the subject, because there is no test by which it can be tried.

" The fact that the testator sincerely believed in many absurd notions, such as mesmerism, clairvoyance, divining and mineral rods, dreams and spiritual influences; that he searched for the

supposed deposits of money by Kidd, and ascribed his failure to
the utterance of certain words by the operator; that he saw the
devil in the shape of a bull, and that he believed in certain
charms for the cure of rheumatism and fever and ague, is no suffi-
cient reason for setting aside a will in all respects rational. (See
Thompson v. Quimby, 2 Bradf. Sur. R., 449 ; S. C. nom. Thomp-
son v. Thompson, 21 Barb., 107.) The learned surrogate said :
' In cases of unusual theoretic belief, it is important to inquire
whether the belief has obtained the mastery of the mind,
or whether it has been held in subordination to the judg-
ment.' "

We will not undertake to say, that in any of those conceptions
which appear to have entered into the mind of Hamilton Wash-
ington, while living, he was laboring under delusion; nor do we
think the evidence in the case goes to establish delusion in the
mind, for we doubt exceedingly whether, if his opinions being
tried by the highest tests of science, reason and experience, they
might not prove to be correct. " Paul, thou art beside thyself;
much learning hath made thee mad," said Porcius Festus. But
as Paul reasoned of righteousness, temperance and judgment to
come, Felix trembled. At least the Christian world would now
say of the Roman functionary, that he was under a delusion ; and
if delusion is insanity, then he was insane.

We would not set aside the verdict in this case merely for want
of the proper form, but we nevertheless regard it with some sus-
picion. If the jury had said, from the evidence we are led to
agree that the will of 1868 is invalid, it would have been better ;
or had they by any form of words alluded to the testimony in the
case as the predicate on which they founded their agreement, it
would have been much better.

But we do not hold that the judgment of the court should be
set aside for this reason alone, but we think the charge of the.

court was erroneous, and well calculated to mislead the jury, and for this reason the judgment is set aside and the cause remanded.

Reversed and remanded.

EVANS, P. J.—This case was submitted to the court before I took my seat upon the bench. I should not, therefore, undertake to express any dissent from the opinion rendered by my associates were it not that after its investigation, which had been specially requested by them, an opinion from me seems to be demanded by the importance of the question respecting the degree of testamentary capacity necessary to sustain a will.

The right of testamentary disposition of property, while it is a strong incentive to its acquisition, is at the same time of great importance in securing respect and attention to the aged and infirm on the part of their families.

But this right is of little worth unless jealously guarded by courts and by juries against the intermeddling of strangers, who with fraudulent devices and cunning deceptions come between the dying and their relatives, and obtain bequests over the destruction of the affections which bind kindred together.

The history of this case presents a remarkably strong instance of an iniquitous will, obtained by the undue influence and fraudulent acts of a stranger to the blood, to the exclusion of the rightful heirs.

The testimony shows that Colonel Washington, whose will is the subject of this controversy, was a Virginian and a gentleman of cultivated mind and polished manners, pure in his language and regular in his habits. He came to Texas, from Mississippi, some thirty years ago, with his sister, Mrs. Beazley, and her family, consisting of her husband and their children. He brought with him some money and property belonging to his sister, which he invested in lands in Polk county, taking the title thereto in his own name, for the reason that he considered his sister's husband, who was blind, incapable of taking care of his family.

Col. Washington tenderly loved his sister, and assigned as a reason for not marrying that her family was all that he desired. He frequently expressed his intention of giving his property to her at his death, and in 1860 he made a will in her favor, which was admitted to probate.

In 1868 he became acquainted with Col. Denson, the appellant, to whom he sold his plantation and other property for sixteen thousand dollars, on credit, taking two notes for two thousand dollars each, and twelve notes for one thousand dollars each.

On the sixth day of June, 1868, he made the will in controversy, in which, after directing that the notes should be first applied to the payment of his debts, he made the following disposition:

   *    *    *    *    *    "I bequeath to the said Wm. B. Benson all the remainder of said notes, and instruct my executors to deliver the said notes to him, to be cancelled so soon as my debts shall have been paid. This bequest is made in consequence of losses and failures of crops incurred since he made the purchase, and also on account of kindness and attention received from himself and his family. All other property, real and personal, of which I die possessed, I bequeath to my sister, Mrs. Mary H. Beazley, for her sole and separate use." To which, on the eighth day of June, he appended the following: "I make this codicil to my last will and testament, bearing date of the sixth of this instant, 1868.—I instruct my executors under no circumstances to press W. B. Denson, so long as he complies with the conditions of the sale by working the plantation and paying the portion of crops agreed upon. I also beg of the creditors, on their own account as well as Col. Denson's, not to press or harass him so long as he works the plantation and pays over the portion of the crop for which he has given a lien."

Two days after the will was written, Sansom, who had been named as one of the executors, wrote the codicil, and, together

XXXIV—13

with Cole, witnessed the will. He testifies that the will was on the table by the side of Col. Washington's bed, and that no others were present except Denson and Cole. After he had read the will, Col. Washington said to him, "You will naturally be surprised that after having sold my property for sixteen thousand dollars I now propose giving it to Col. Denson for about five thousand dollars. My reasons for this are, that at the time I sold to him I expected him to make a good crop. He has failed to make a cotton crop, not having got a stand. I further think that if I leave this property for you, as executor, to make the money to pay my debts, in the condition the country is in, very little would be left. What there is left I desire Col. Denson to have the benefit of, as he and his family have been very kind to me."

It appears from the testimony of several witnesses that the will was prepared at the house of Col. Denson, one or two days after the testator took his bed, from which he never arose; that Denson, after purchasing the plantation, moved with his family into the house, and that Denson's brother-in-law, Cole, and his family, also lived in the house with him. He was separated from all his family and former friends, with no one near his bedside but Denson and his brother-in-law, Cole. Denson became acquainted with Col. Washington about six months before his death, and for that time resided with him in the same house, with every opportunity for exerting an undue influence upon his mind, which was enervated by disease, by age, and by the fierce calamities of revolution and war, which involved the loss of his property and the overthrow of his long cherished political and social theories, at an advanced age, too, when his physical energies were decayed, and when all hopes of the future were gone. He imagined that all his neighbors had combined against him, and rejoiced at his downfall. Some Indians, who were his former wards and pets, were no longer of any interest. He imagined that his family servants had become his enemies, and meditated his assassination, and that all his family

had turned against him except his sister, whom he remembered in his last hours, and expressed a transient pleasure in believing that something would be left her after satisfying the illusory claims of Denson and his family, etc.

His bed-room was over the dining-room; and when at their meals, Denson and Cole would talk in a loud tone of the gloomy prospect for a crop, and frequently reiterated that it would be a failure. They brought him a twig of cotton, on which were two worms, and told him that they considered the cotton crop as gone, and that the corn crop was fast going to destruction on account of the drought. After they had retired he remarked, "It is all gone! all gone!"

Col. Washington, about 3 o'clock in the morning of the day the codicil was written, called Cole to his room, when he said to him that he was sick "*nigh unto death*," and thought that he had been poisoned by a negro boy, but changed his mind in a few moments, and said he was poisoned by some Irish potatoes he had eaten. He said to Sansom that evening that he had been poisoned by eating Irish potatoes; and one or two days afterwards he repeated the same to Dr. Hill, his physician, and also to Mrs. Hill, who stayed with and nursed him for several days. This lady, in her testimony, says: "He required me to cook everything he eat, and to draw the water he drank, with my own hands. He would not drink water brought him by another during my absence from his room. He would not drink a cup of coffee brought him by a servant, but made me take it away and make a cup and bring to him with my own hands. During my visit, and after he had been convalescent for three days, he asked me to take a trip with him to Lampasas Springs, and told me that the mutton there was of the same peculiar flavor as the mutton I had relished so much when with him at the Bedford Springs in the summer of 1833—which was just thirteen years before I was born—and was much worried with me when I denied having been at the Bedford

Springs, assuring me that I had been there with him, and that when I tasted the mutton at Lampasas I would remember all about it."

Dr. McCardles, a practicing physician, thought Col. Washington's conduct towards him very strange. He heard Mrs. Hill's testimony and thought, admitting it to be true, that Col. Washington must have been crazy. He thought that if he was of the same belief on the sixth of June, when he wrote his will, that he expressed on the seventh of June, about being poisoned with Irish potatoes, that he was laboring under a delusion then.

Dr. Hill, who was his attending physician, regarded Col. Washington's delusion of being poisoned as springing from an unsound state of mind. He stated that his mind was unsound on the subject of free negroes; and described his mental condition as that of " insane delusion."

Dr. Beazley had known Col. Washington for years, and prior to the war had lived with him the greater part of his life, and for several years had acted as his clerk and agent, or man of business. During the first year of the war he saw nothing to induce him to believe Col. Washington to be of unsound mind. He saw him in 1862, and immediately noticed that he was not what he had been ; formerly he was mild, gentle and kind in disposition, and regular in his habits, but was then peevish and irritable, and disorderly in his general conduct. His habits were changed—instead of retiring early as usual, he would sometimes walk until late at night, and was moody and unapproachable. He considered this change the result of mental depression caused by the state of his affairs. M. Davidson noticed, from Col. Washington's conversation, that there was something wrong with him. He spoke coldly to him, and said " You are all a set of damned swindlers, and I am mad enough with you to kill you. He then went into his room, and when he came back and took a chair I saw the handle of a dirk or bowie-knife, under his vest. There was nothing to justify unkind feelings."

Louis McComb had known Col. Washington for twenty years and was on intimate terms with him, and was frequently at his house. "Last fall, went to him to borrow a wagon, when he got into a passion. His conduct was unnatural, and his character was changed from what it had been."

Col. Sansom had known Col. Washington for twenty years, and had always considered him eccentric, with strong passions and prejudices, and easily influenced by those he liked. After the war, he had noticed an increased irritability of temper and perverseness of disposition. He became notionate and changeable in his latter years ; would reason logically, but failed to carry out his plans. He attributed this to his old age, the condition of the country and the difficulties under which he was laboring.

In 1866 he dressed up his negroes and drove them about in his carriage, but fell out with them in a short time, cursed and abused them, and threatened to shoot them like dogs. He suspected that they intended to assassinate him to get his plantation. He also thought that his neighbors had combined against him for his ruin; said several times to Sansom that he (Sansom) was the only gentleman in the neighborhood, and the only one of his neighbors who had not arrayed himself against him. He thought the poor man rejoiced at the downfall of the rich man, and that the poor rejoiced at his downfall and loss of property.

Benjamin Brooks had known Col. Washington for thirty-two years ; had belonged to the Beazley family ; testifies to a great change in Col. Washington since the war.

Alfred Brooks had known Col. Washington thirty-two years ; was his carriage driver ; saw a great change in his character since the war ; he was very cross; thought him crazy.

On the other hand, the subscribing witnesses to the will state that they saw nothing indicating that Col. Washington was of unsound mind. But there is no evidence in the record contradicting any witness as to the truth of any specific fact or circumstance related by them.

Different witnesses who thought Col. Washington insane based their opinions upon observations of facts and incidents which transpired at different times.

From the delicate nature of all investigations into the state of the human mind, it is not to be expected that a witness should accurately describe the symptoms of mental alienation; yet opinions, by the settled rules of law, are evidence. The value of these opinions depends upon the opportunities, the length of acquaintance, and the intimacy of their personal relations, which enable them to judge of the mental condition of the deceased.

The court, in an extremely able charge on all the questions suggested by the evidence in the record, instructed the jury to find the will invalid, if they believed from the evidence that the testator was of unsound mind at the time of its execution, or that it had been procured by undue influence, or by fraud.

The jury returned a general verdict that the will was invalid, without specifying grounds for their finding.

The correctness of this verdict and the judgment thereon depends upon the correctness of the charge of the court upon the law of the case, and especially when applied to *insane delusion*.

This court express the opinion that there is error, and point particularly to the following paragraph in the charge: "The delusions which are the ordinary accompaniments and evidences of insanity, are extravagant or impossible things which do not exist at all except in the imagination of the insane person, but which he cannot be persuaded or convinced do not exist."

It is apparent that the words "belief of," or words of similar import, are omitted in the transcript. If these words be supplied we have a definition of "delusion" almost identical with that given by Redfield, who says: "Delusion is defined to be when a patient conceives something extravagant to exist which has no existence but in his own heated imagination, and having so conceived it, is incapable of being reasoned out of the conception."

Indeed, the charge, in its several divisions, appears to have been copied directly from the authorities, and whatever error there is consists in too close an adherence to the definitions of insane delusion as expressed by medical writers and jurists, none of whom have succeeded in embracing all the phases of insane delusion within the compass of a definition. Redfield, referring to the definition of the author of the "Medical Jurisprudence of Insanity," says: "The learned author will find it not sufficiently comprehensive to embrace all cases of insane delusion. For, many cases of delusion are none the less obviously morbid and the result of *insane* perversion, in that they are not absolutely impossible." (1 Red., 71, 72.)

Taylor, in his work on Medical Jurisprudence, (p. 624) says: "The main character of insanity, in a legal view, is said to be the existence of delusion, *i. e.*, that a person should believe something to exist which does not exist, and that he should act upon this belief. *      *      *      *      *      *      Unsound mind (non compos mentis)* of the exact meaning of which it is impossible to give a consistent definition. From various legal decisions, it would appear that the test for unsoundness of mind in law has *no immediate reference to the mere existence of delusion."*

In the still imperfect state of, shall we call it, mental philosophy, it is impossible to lay down any particular definition of insanity, founded on symptoms, which will determine the point where testamentary capacity ceases, either absolutely or by pressure of undue influence.

"Jurists," says Dr. Ray, "who have been so anxious to obtain some definition of insanity, which shall furnish a *rule* for the determination of responsibility, should understand that such a wish is chimerical from the very nature of things."

And, indeed, until within a few years past, the nature of mental diseases has been but little understood, even by those who have

Dissenting opinion of Presiding Judge Evans.

made the subject a special study ; not until science abandoned its fruitless inquiries into the nature of mind, and directed them to the brain as its local habitation.

" Whatever opinion," continues Dr. Ray, " may be entertained of the nature of the mind, it is generally admitted, at least by all enlightened physiologists, that it must of necessity be put in connection with matter, and that the brain is the part of the body by means of which this connection is affected. Little as we know beyond this single fact, it is enough to warrant the inference that derangement of the structure, or of the vital actions of the brain, must be followed by abnormal manifestations of the mind. · * * * This vital change is now generally expressed by the term ' *irritation*,' and nothing is implied by it, relative to the nature of this change, more than an exaltation of *action*. Irritation, then, is the initial stage of the disease — the first in the chain of events of which disorganization is the last."

Mental disorders are therefore as multiform as are the mental constitutions of the insane—varying in degree and intensity at every stage, from its first departure from the normal course of vital action of the functions of the brain, to the total destruction of the brain itself.

" Mania is characterized by unnatural exaltation or depression of the faculties, and may be confined to the intellectual or to the affective powers, or it may involve them both ; and these powers may be generally or partially deranged. Dementia depends upon a more or less complete enfeeblement of the faculties, and may be consecutive to injury of the brain, to mania, or to some other disease ; or it may be connected with the decay of old age." (Wharton & Stille, 60.)

The term, " moral insanity," is usually applied to those mental disorders which are confined to the affective faculties, or where the derangement of the affective faculties is the striking feature of the disorder.

Diseases which extend over a part of the understanding, or affect one or a few of the moral or intellectual faculties, are denominated "monomania."

Dr. Ray (§ 242) says: "The more one sees of mental disorder the more, we apprehend, is he disposed to believe that this integrity of some of the functions in partial insanity is rather apparent than real; that the disease, however limited, seldom, if ever, fails to irradiate its morbific influence to a greater or less extent."

In this view Wharton and Stille, Taylor and Beck concur, and we may, therefore, regard it as settled that moral insanity and monomania, or partial insanity, are different types of madness, and never fail to involve all the mental faculties in a greater or less degree; and whether, in their ravages upon the human mind, they only weaken and partially impair, or destroy altogether, testamentary capacity, must be determined from a view of all the facts in each particular case.

Now, that the mind of Col. Washington, at the date of the execution of the will, was considerably impaired by disease and the infirmities of age, if not totally incapacitated to make a valid will, has been affirmed by the probate court, by the jury who heard all the witnesses examined and all the testimony introduced, as well as by the court in which it was tried, and when we compare the facts as disclosed by the record in this case with the rules of law as laid down by the highest authorities on medical jurisprudence, we find they are fully sustained.

Col. Washington was remarkable for peculiarities and idiosyncracies of thought and feeling, which contrasted strongly with the general tone of society, but they never suggested to those who had known him for twenty or thirty years any thought of mental disease. It was the total change in his character, the wide departure from his peculiar habits and modes of thought and feeling which produced the impression of mental disorder.

These idiosyncracies of Col. Washington, whether they had their origin in any peculiarities of the cerebral organism, or in any great disparity of the intellectual organs, may not have been inconsistent with robust health of mind. Yet, viewed in the light of science, they involved a greater than usual susceptibility to mental derangement, which, for its development, only required the operation of the exciting causes to which he was unhappily subjected.

Professor Wood, in treating of insanity, says: "In the great majority of cases, insanity is produced by the influence of exciting causes acting upon a predisposition to that disease." And among the predisposing causes he mentions a tendency to insanity by inheritance, and from a nervous and melancholic temperament—such as have naturally strong passions in excess, as ambition, pride, and love of applause. The rich and cultivated, he remarks, are more subject to it than the poor and ignorant, for the reason that their cerebral functions are, from their position and habits, more liable to over action. Celibacy favors the inroads of insanity. Excessive mental excitement, whether intellectual or emotional, is probably among the most frequent causes. Examples of this last are found in the exciting struggles for power, influence and wealth. Nor are depressing causes without a powerful influence—such as reverses in business, the loss of friends, or the triumphs of enemies. So, also, times of great public excitement, whether of business, war, politics or religion, are usually attended with a marked increase of the disease; revolutionary struggles, insurrectionary violence, and powerful political commotions strew their course with ruined bodies, minds and estates. (2 vol. Wood's Practice of Med., 714.)

These manifestations of so marked a change in his character, co-existing with a like change in his fortunes, observed by so many witnesses, are unmistakable symptoms of mental derangement as recognized by physicians and jurists.

"One of the earliest symptoms of the disease," says Dr. Ray, "is an unaccountable change in the patient's social and domestic feelings. He becomes indifferent to those whom he loved the most." * * * "The higher affections are dormant, while all his relations to his fellow men are viewed through a medium of fear, suspicion, jealousy and distrust. His friends and relatives especially are objects of his suspicions, and nothing can induce him to view them in any other light than as enemies to his moral and physical welfare."

Wharton & Stille remark that "Extreme irritability, proneness to anger, suspicion, concealment, obstinacy and perverseness are common."

Gerhard, in his work on Nervous Diseases, says: "A dislike of relatives and friends formerly beloved, and even objects of the warmest affections, is well known to be a feature of madness, and belongs particularly to moral insanity." * * * "A proneness to suspicion is very often manifest; the most trifling circumstances are often sufficient to give rise to a train of formidable apprehensions, which the insane person harbors, and over which he broods until he comes at length to believe them as matters of fact. The disorder then passes into monomania." * * * "Nothing is more common in morally insane persons than a dread of being *poisoned*. It is an unfavorable symptom, and marks in the disorder a disposition to become converted into monomania, or into 'melancholy dejection.'"

Redfield, on the Law of Wills, says: "The belief in the existence of mere illusions, or hallucinations, creatures properly of the imagination, such as no sane man could for a moment believe, are unequivocal evidences of insanity." * * * "One of the most reliable evidences of insanity is where the individual comes suddenly to exhibit a marked change in his habits and tastes, preferring what he before avoided or disliked, and where there is no assignable cause for the change, unless it be one affecting mental capacity." * * * * * *

" Fondness or aversion to particular persons without any special reason."    *    *    *    *    *    *

" Another one of the most undoubted evidences of insanity in many persons is *the entire surrender of their wills*, and the apparent submission to chance direction, or the caprice of others ; and this surrender of the will often occurs in persons of the strongest understanding and the most self-reliant."

These authorities, when applied to the facts of this case, compel the inference that Col. Washington's mind was impaired; but, had his will been just and considerate, and not what the civil law writers denominate " an undutiful testament," sufficient capacity to make it might have been inferred.

But, as the will is unreasonable, unjust, and in favor of a party having no claims upon him, and who had opportunities for influencing his mind, and used that influence to secure the bequest in his own favor, the inference of testamentary incapacity becomes almost irresistible. (Redfield, 105, note 17, 504, § 14.)

The degree of undue influence which will avoid a will cannot, in the nature of things, be defined. The processes of spiritual influence are inexplicable. It is none the less efficacious when working unseen. It is known only in its opportunities and in its results.

An illustration of undue influence acting upon a sound mind is cited by Redfield from an opinion of Eyre, C. B., who says: " Yet, if such a dominion or influence were acquired over him as to prevent the exercise of such discretion, it would be equally inconsistent with the idea of a disposing mind, (as if actual force were resorted to,) and perhaps the most probable instance of such dominion being acquired is that of an artful woman having taken possession of a man and subdued him to her purposes."

Dr. Taylor (in his Med. Jur., 650,) gives the following: " A person's mind, in extreme old age, may be quite intelligent, his understanding of business clear, and his competency to converse

upon and transact such undoubted, and his bodily strength good ; but there may grow upon him such a fear and dread of relatives, who may have surrounded him, and on whom he may have become perfectly dependent, that his nervous system is wholly overcome, and he becomes a mere child and tool in the hands of those about him."

" But in practice we *have always found juries* disposed to infer undue influence, or a want of proper capacity, or both, where the will itself seemed to indicate in a high degree *injustice* and want of proper consideration in the testator, if there was the slightest evidence in support of it.    And although, in theory, either want of capacity or undue influence require distinct and satisfactory proof, we could never feel any strong impulse to interpose in behalf of an absurd, or unjust and unequal will, in order to withstand the common sense instincts of a jury against the validity of such an instrument."    (1 Redfield, 526, § 37.)

If this most philosophic writer should thus announce his disinclination to interpose in behalf of an unjust will against the common sense instincts of a jury, upon the slightest evidence, in a case like this we can have no hesitation.

The testimony is clear that Col. Washington, whose mind was considerably impaired by disease, was extremely susceptible to the influence of others, and Mrs. Hill's testimony shows particularly the means employed by Denson, the beneficiary in this case, to influence the mind of the testator in his favor.

When we look to the will itself, wherein his estate is conferred upon almost a total stranger, who had wormed himself into his confidence, with the reasons assigned to Sansom for making such an unnatural bequest, the conclusion is irresistible that this will is rather the expression of Denson's wishes than the will of Col. Washington.