WATERS *vs.* CULLEN.

*In the matter of proving the last Will and Testament of* BRIDGET CULLEN, *deceased.*

MARRIED women, by the act of 1849, are competent to devise and bequeath real and personal property in the same manner and with the like effect as if they were unmarried.

The operation or effect of the will, on the estate or rights of the husband in the property of the wife, cannot be considered on the probate.

It is the duty of the Surrogate, on proof of due execution, to admit the will to probate, leaving the question as to what passes under the instrument, for future construction.

The power to make a will relates to the personal capacity and the probate: the right to dispose of certain property relates to the effect of the instrument when proved, and its construction.

An unequal will, made by a decedent who for some time before her death had been subject to attacks of *delirium tremens,* and at the time of making the will was under delusions likely to affect her testamentary provisions—rejected.

W. C. FREEMAN, *for executors.*

J. B. SCOLES, *for next of kin.*

I. The testatrix was not of sound and disposing mind and memory, at the time of the execution of the will. (*Dean's Med. Juris.*, *p.* 563.)

II. The will is not entitled to any favor. It makes an unfair and unnatural distinction between her children, and entirely cuts off those who most need the small pit-

tance that would come to each child upon an equal division of her property,—the youngest infants.

III. The property devised was purchased by the testatrix when a widow. It did not come to her from her former husband.

IV. Bridget Cullen was legally incompetent to make a will, she being a married woman, and having intermarried with Dominick Cullen, on the 24th April, 1847.

By the laws in existence at the time of the marriage, a married woman could not make a will, and the absence of this power on her part, vested the husband with certain rights in case of survivorship ; that of administering upon her estate, &c.

These rights Dominick Cullen acquired on the 24th of April, 1847, by his intermarriage with Bridget Cullen, then Bridget Briody.

Could the Legislature by a law passed in 1849, divest him of those rights, by granting to his wife the right to make a will?

We insist that the third section of the act of April 11th, 1849, is *prospective* in its operations :

1st. It is a fundamental principle, that all statutes are so to be construed, if possible. They are never to have a retrospective operation, unless any other construction would violate their letter and spirit. (*Danks* vs. *Quackenbush*, 1, *Denio*, 128 ; and 3 *Denio*, 594, *affirmed in Court of Errors.*)

2nd. Whenever it is intended that " women now married " shall be affected by the provisions of any section, it is expressly stated in such section.

3rd. It cannot be construed otherwise than prospectively, without affecting existing rights. To construe the statute so as to give women then married the right to make a will, would be to affect rights which the husband acquired by the marriage contract, and thus make this section of the statute retrospective in its operation.

If no other than a retrospective operation could be given to this section of the statute,. it would be unconstitutional and void, so far as it undertook to interfere with the existing rights of the husband.

This view has been taken of the statute in question by several of our judges.   We refer to the following cases:— (*Snyder* vs. *Snyder*, *per Harris, J.*, 3 *Barbour*, 621, *Holmes* vs. *Holmes*, *per Barculo, J.*, 4 *Ibid*, 296, *White* vs. *White*, *per Mason, J.*, 4 *Howard Pract. R.*, 103.)

THE SURROGATE.   The decedent was a married woman, and as her marriage took place before the passage of the act of April 11, 1849, her competency to make a will is denied on the ground that the act in question is prospective in its operation, was not designed to give the power of devising to women then married, and that if so designed it was unconstitutional and void, so far as the rights of her husband were concerned.   The language of the statute is certainly very broad:—" *any* married woman  .  .  .  may devise real and personal property  .  .  .  in the same manner and with like effect as if she were unmarried."   On the supposition that marriage is such a contract as makes all the laws relating to the property of husband and wife, existing at the time, a part of the contract, so that the Legislature cannot repeal or modify them even in respect to property to be acquired after such change of the law—even on that hypothesis, I cannot see that that operation or effect of the instrument on the rights of the husband can be set up against the proof of the will.   For example, the will may not touch the supposed rights of the husband at all—but may only give what the wife has an undoubted right to give, such as an estate in fee in lands, of which the husband is an acknowledged tenant by the curtesy.   It is obvious that the bearing of the will upon the rights of the husband is a question of construction.   As the law now stands, all married women have the capacity to make a

will; they are clothed by the statute with testamentary power; and it is the duty of the Surrogate, on proof of the due execution of the instrument to admit it to probate. What real or personal property passes by the will, and what does not, is clearly a matter which has nothing to do with the probate in this class of cases, more than in any other. As it would be an extraordinary and novel objection to make to the proof of a will of a male, that it undertook to give property not belonging to the testator, so, it is quite as incongruous to urge, as an objection against the proof of the will of a married woman, that it disposes of property belonging to her husband by virtue of his marital right. The power to make a will is one thing, and the power to dispose of certain property another. The former relates to the personal capacity and the probate—the latter to the effect of the instrument, when proved, and its construction.

The will now under consideration is contested on another ground, which I think fatal.—The decedent died of *delirium tremens*, to which disease she had been subject more or less for some time before her decease. She gave her property, consisting of a house and lot in this city, to her children by her first husband, and left her children by her last husband penniless. It appears that she advanced as a reason for this, that the property in question came from the estate of her first husband. It is also shown that at the time the will was executed, she believed that she had been poisoned by the father of the children she left unprovided for. Delusions of this kind are common in cases of *delirium tremens;* and there is nothing in proof, to show in the present instance that there was any possible ground for the suspicion she entertained. Nor has any evidence been offered to establish the derivation of the property she devised, from the estate of her first husband. These delusions were material; for a person resting under them might possibly be led to give the estate to one set of

children to the exclusion of the other. It is necessary, indeed, to search for some such reason, in order to comprehend how a dying mother could leave offspring of a tender age entirely destitute, and prefer children more advanced in years and better able to sustain themselves. It is true the subscribing witnesses, both of whom were competent judges to the extent of their means of observation, were of opinion that her mind was sound; but they had never seen her before the instrument was executed, and had but a limited opportunity of ascertaining the state of her mind. Her attending physician thinks he was present the evening the will was said to have been executed, between 11 and 12 o'clock; but the subscribing witnesses did not see him; and he is probably mistaken as to the time, for the will is dated the 20th of December, she died on the 8th of January, nineteen days after, and yet he thinks the will was executed two or three days before her death. The doctor, however, testifies very explicitly that the state of her mental faculties varied from time to time,—"sometimes very clouded, and at other times she would be perfectly possessed of them." . . . "Very variable throughout the whole time."

Mr. McKiernan, who called in the lawyer to make her will, without the directions of the deceased, gave some particulars of the symptoms of her disease. He expresses the opinion that she was insane. He states that for a month before the execution of the will she would at times shew signs of mental aberration, saying her husband had poisoned her—shouting out for the doctor—running out undressed into the entry—exclaiming that there were people in her room—that there was something in her throat—wishing a quill to be put down to remove it—and fancying that there were devils coming down out of the ceiling. The afternoon of the day the will was made, she was out in the entry undressed, crying out for a doctor; and when he returned with the will in the evening, she was calling for

the doctor, and talking about the place in her throat. Her daughter went to her bed-side to quiet her, saying "that the lawyer was there with the will;" and McKiernan did the same. It is observable that McKiernan first observed her mental disorder, when she told him she had been poisoned by her husband. And it appears from the evidence of the subscribing witnesses, that at the time of the execution of the will, her countenance was flushed and bloated,—she wanted her doctor, was vomiting and retching, and had evidently been taking liquor; so that Mr. Martine says that if she had not stated that she had been poisoned by her husband, he would have supposed her sickness had been produced by liquor. The facts observed by the subscribing witnesses were not sufficient to authorise their entertaining the belief that she was intoxicated, or under the influence of *mania à potu.* But with the additional circumstances now brought to light—the evidence of the physician as to the character of her disease, and that of McKiernan as to distinct acts of wildness of conduct and speech—the fact that on that very afternoon she had left her bed and gone into the entry—that at the very time of the execution, she was calling for the doctor, talking about her throat, and accusing her husband of poisoning her,—with all these additional circumstances it is impossible not to conclude that she was not in a fit mental condition to make a will. There is decided evidence of delusion; and although from the peculiar character of her disease this did not shew itself on points likely to attract the attention of the subscribing witnesses, yet with the proofs now afforded the Court, it is manifest these delusions were symptomatic of the species of *mania* with which she had, at intervals, been afflicted for a considerable length of time. I am of opinion, therefore, that the will should be refused probate.