NEW YORK COUNTY.—HON. D. C. CALVIN, SURROGATE.— July, 1881.

## MERRILL v. ROLSTON.

*In the matter of the probate of papers propounded as the last will and testament, and a codicil thereto, of* CAROLINE A. MERRILL, *deceased.*

The setting aside or rejection of a will by a court, is the exercise of a radical judicial prerogative, which should not be indulged, except upon very satisfactory proofs.

One who is next of kin to a decedent has an interest which entitles him to contest the probate of an alleged will of the latter ; and the same is true of one who, by the admission of the will, would be deprived of rights under a former one.

Partial insanity, or monomania, invalidates a will which is the direct offspring thereof, though the testator's general capacity be unimpeached.

An insane delusion is one wh'ch not only is founded in error, but is without evidence of its truth, and often exists against the clearest evidence to the contrary. Its essence is that it has no basis in reason, and cannot be dispelled thereby.

The decedent and her husband, in 1838, informally adopted G., the former's nephew, with the intention of leaving him their property, educated him at Trinity College, Dublin, and traveled with him in Europe. G., at their request, took their name, and always afterwards bore it. The husband, who always manifested great affection for G., died in 1867, leaving a will made in 1856, which gave to G. $30,000,

MERRILL v. ROLSTON.

and all his property, in case the former survived decedent. The latter made a will in 1856, giving all to her husband if he survived her, otherwise to G. In 1854, G. engaged in business in New Jersey, and, during some years thereafter, living apart from his adopted parents, received numerous letters, from time to time, from decedent, the general tenor of which was one of deep interest, admiration, and affection, she addressing him as her dear son, etc., and signing as his affectionate mother. In 1862, G. married an estimable lady, against decedent's will, his engagement having already led to an estrangement from, and his rejection by decedent. In numerous letters thereafter, and down to the close of her life, though the character and conduct of G. remained, in all respects, exemplary, decedent repeatedly expressed her dislike, distrust and hatred of him; refused him her name, suggesting that if he had married one of certain persons specified, his name would have been hers ; mutilated her will of 1856 and his portrait, cutting from the latter the mouth and thumb, as an evidence of her displeasure ; addressed to him violent and senseless imprecations, and indulged in vulgar and baseless charges against the character of himself and wife. There was also evidence of strange and eccentric conduct on decedent's part, in other respects. In 1871, she executed the paper propounded as her will, in which she ignored G., and gave the bulk of her fortune to charities, and to clergymen of the Roman Catholic Church, of which church she had become a member since 1856. In 1875, she executed the paper propounded as a codicil, reciting the death of Bishop Bacon, a legatee, and substituting Cardinal McCloskey. Two prominent ecclesiastics of said church aided in the preparation of the codicil, and signed the same as witnesses, but took no benefit thereunder. Contestants put in issue decedent's mental capacity, and freedom from restraint. *Held,*

1. That the facts relating to the execution of the codicil did not justify any presumption or suspicion of undue influence.

2. That, upon the whole evidence, no reasonable doubt arose of the general capacity of decedent, and the unrestrained execution of the will and codicil ; and that the same must be adjudged valid, unless vitiated by an insane delusion respecting G.

3. That decedent's said adopted son had an interest which entitled him to contest the probate of the instruments propounded, and that they should be refused probate, because executed by her while laboring under an insane delusion concerning him,—the same being the direct offspring of such delusion.

The influence or importunity which is sufficient to avoid a will must be such as amounts to moral coercion, restrains independent action, destroys free agency, and makes the will the act of another than the alleged testator; it must have been exercised with regard to the very act, and the exercise will not be inferred from opportunity or interest.

The earnest presentation to a testator, by a spiritual adviser, of proper ar-

guments, and the enforcement of motives, whereby the intellect is persuaded and the conscience quickened, are legitimate influences, and the results praiseworthy, where they do not violate natural obligations.

APPLICATION for the probate of a will and codicil.

The paper propounded as the will was dated May 2, 1871, witnessed by Cyrus W. Field and Benjamin Cartwright.

After providing for the payment of debts and funeral expenses, it gave to New York Hospital $50,000 ; to the Sisters of Charity of St. Vincent de Paul, $5,000 ; to the Portsmouth Atheneum, N. H., $2,000 ; to Cardinal McCloskey, $50,000 ; and in case of his death to his successor, or in case of vacancy to the Ordinary ; to decedent's niece, Caroline S. Delgardo, $5,000, household furniture, ornaments and wearing apparel ; to Doctor George H. C. Salter, $5,000 ; to Bishop Bacon, of Maine, all the residue ; to his successor in case of his death, and in case of the vacancy of the office, to the Ordinary. Moses Taylor and R. G. Rolston were appointed executors.

The paper propounded as the codicil was dated December 9, 1875, witnessed by Drs. Chatard and Smith, recited the death of Bishop Bacon and the lapse of the legacy, and gave the property given by the will to him to Cardinal McCloskey, and in case of his death before decedent, to Rev. Thomas S. Preston ; and recited the lapse of the legacy to Dr. Salter, and directed the executors to pay the interest on that sum to his daughter Mabel until twenty-five years old, then the principal to her ; and revoked all parts of the will inconsistent with the codicil, and a codicil executed in Rome, January, 1875.

Objections were filed by George Merrill, a nephew and

alleged adopted son, together with numerous other next of kin, no nearer than he, putting in issue the mental capacity and freedom from restraint of decedent. Further facts sufficiently appear in the opinion.

TURNER, LEE & McCLURE, *for R. G. Rolston, proponent.*

J. K. PORTER, *for Cardinal McCloskey.*

F. F. VANDERVEER, *for Bishop Healey.*

JOHN E. PARSONS, *for Geo. Merrill.*

HOMER A. NELSON, D. R. JACQUES, D. C. BROWN, *and* EDW. GEBHARD, *for next of kin.*

THE SURROGATE.—[After giving an abstract of the evidence, which was very voluminous.]—The questions to be determined from the evidence are :

*First*, whether the decedent, when she executed the will and codicil propounded, was of sound and disposing mind, or of such impaired intellect as to render them void under our statute.

*Second*, whether the decedent, being of sound and disposing mind, was unduly influenced in the execution of said will and codicil, or either.

*Third*, whether, if mentally sound in other respects, she was laboring under an insane delusion, or was a monomaniac as to the relations and conduct of her so-called adopted son, George Merrill, his feeling and conduct towards her, his marriage, and the character of his wife.

*Fourth*, whether, assuming that she was laboring under an insane delusion in respect to George Merrill, and his conduct and feeling towards her, his relations to and claims upon her were such as, according to law, will avoid the will and codicil.

*Fifth*, whether the will and codicil devised and bequeathed more than half of decedent's property to any benevolent, charitable, literary, scientific, religious or missionary society or corporation, in trust or otherwise.

There being no question raised as to the sufficiency of the proof, to establish the due and formal execution of the instruments propounded, I proceed to consider the above points in their order.

The principal facts upon which the contestants claim to have established the mental unsoundness of the decedent when the will and codicil propounded were executed are : *First*, the material changing of the provisions from that of her will of November 15, 1856, especially in regard to her adopted son, George Merrill, so called, and the disposition of the major part of her property to Roman Catholic officials or charities. *Second*, the extraordinary and violent change of sentiment and feeling on decedent's part towards George, from the great and demonstrative affection, warm interest and pride in him and his character and attainments, to the most extravagant distrust, dislike, hatred and vindictiveness towards him, culminating in his disinherison.

Her change of religious belief.

Her unreasonable and extravagant conduct respecting the loss, by her husband, of $600, by Green & Co., and her absurd talk about that loss and measures taken to redress it.

The alleged change of the decedent in her dress and personal habits, testified to by quite a number of witnesses having full opportunity to observe.

Her singular manifestation of interest in, and affection

for her courier, Maffei, and the indelicate familiarity of intercourse and correspondence between them.

Her alleged intemperate habits and eccentric and irritable demeanor, incoherency of speech, and strangeness of disposition, testified to by quite a number of witnesses, especially her suggestions to Mrs. Clift and to Mr. Leland, of her being poisoned, chronic dislike of her own sex, her conduct before the Surrogate of Brooklyn in the Knight matter, her treatment of Mrs. Kelly and her washing bill, her strange conduct at Washington, at her interview with the President.

Her alleged insane delusion and irrational conduct respecting George Merrill, his supposed neglect of her and her husband, his improper interference in the Green & Co. matter and her business affairs, his want of interest in and attention to her, and her wishes, particularly as to his marriage, his character and intercourse with his wife, her character, and that of her relative Mrs. Clift, her oft-repeated statement, that his adopted father distrusted and felt no affection for or interest in him, her belief that the Green & Co. loss had killed her husband, her charging George with the duty of pursuing them even to the expenditure of her whole estate, her apparently purposeless mutilation of her will of 1856, and her mutilation of George's portrait, and the reasons stated therefor, and her fiendish imprecations, contained in several letters, upon him; all of which facts seem to be to some extent sustained by her own letters and well-attested declarations, principally proved by Mr. Field, Dr. Harris, Stewart Brown, Mr. Sherman, Thurlow Weed, Fanny Post, General Saxton, Mrs. Salter, Mrs. Mitchell, Mr. Barrett, Abby Gross, Mrs. Hawkins, Mr. Putney,

Mr. Luce, Mr. Gleason, Mrs. Laine, Mr. Platt, Mrs. de Reau, Mr. and Mrs. Borgogni, Drs. Fideli, Mr. Franceschini, Mary Ellis, Mr. Tuckerman, Drs. Hadden and Quackenboss, and George Merrill. But Mr. Field, Mr. Weed, Moses Taylor, Messrs. Saxton, Mr. Hawkins, Mrs. Laine, Mr. Platt and Mr. Tuckerman only testify in respect to her apparent insane delusion respecting George and his wife, and the Green & Co. matter; the Doctors Fideli both disclaim any intention to express the opinion that she was in any sense insane, but they deemed her absurdly eccentric, and sometimes incoherent and excitable; several of those witnesses, particularly Messrs. Weed, Taylor and Field, testify to facts which leave no doubt as to her entire soundness of mind, except as to her so-called delusion respecting George Merrill and his wife.

The testimony which is relied upon to controvert the allegation of mental unsoundness, is that given by Mr. Field, the surviving witness to the will, Mr. Glover, who received the instructions of decedent for the will, drew it and submitted it to decedent for her consideration and approval, and who supervised the execution; that of Moses Taylor, who saw her about the time of its execution; that of Drs. Chatard and Smith, the subscribing witnesses to the codicil, whose testimony concurs in respect to the mental soundness of the decedent, and clear intelligence when those instruments were executed respectively, and the death of Bishop Bacon, rendering it proper and necessary for a codicil; that of Catharine Welsh, who observed no eccentricity of dress or untidiness of her room at the Astor House; Mrs. Smith, who concurred in that testimony, and who testified to her

manifesting an interest in Bishop Bacon and Archbishop McCloskey and the Catholic Church; Vicar-General Quinn; Mr. Foley, the attorney at Saratoga; Mrs. Kelly, who sued decedent for her washing bill; Mr. Stetson, the hotel-keeper, where decedent passed much of her time; Mrs. Thompson, who saw decedent in Rome in 1874; Mary Seton, who saw much of her in 1869, and afterward instructed her in the faith, and visited her several times; Mr. Usher, whom she informed that she had settled her affairs with Bishop Bacon, and intrusted them to Cardinal McCloskey; Mr. Shea, a waiter at the New York Hotel in 1864 and 1865; Mrs. Davis, who met decedent in Rome about 1868, and with whom decedent conversed about George; Mr. O'Toole, a porter at the Fifth Avenue Hotel in 1864 or 1865; Catherine Mc-Nierny, a chambermaid at the Fifth Avenue Hotel; Bridget Reynolds, chambermaid at the same; Patrick Houlahan, porter at Saratoga; Mary Gurney, chambermaid at Fifth Avenue Hotel; Bishop McNierny, who saw decedent in Europe early in the year 1877; Mary Welsh, chambermaid at the Fifth Avenue Hotel; Mr. Gordon, porter at the Sturtevant House; Mr. Lugani, hotel-keeper at Rome,—all testify to her intelligence, rational conduct and conversation. Several of the servants and hotel-keepers state that they found her room in order; that her dress was not particularly observable or eccentric, and that her person and conduct were not such as to attract particular attention or excite observation. Added to those, we have the fact that decedent continued to travel from place to place, crossing and recrossing the ocean, attending to the payment of her bills and fare; a diary of her travels and book of account,

commencing with January 23, 1872, and continuing down to July, 1876, in which are entered numerous items of receipts of money from her bankers in Rome, embracing over twenty items ; various letters of decedent, one of instructions to Bishop Bacon, evincing judgment, discretion, propriety of expression and entire coherence ; a short letter of hers to Mr. Taylor, under date January 17, 1873, showing her intellect clear and coherent ; indeed, it may be said that nothing which decedent appears to have written, down to the attempted instructions, in the autumn of 1877, to Mr. Merrihew, just before her decease, shows any evidence of mental weakness or aberration. I leave out of consideration the attempted instructions to Mr. Merrihew for a new will, and the material difference in her expressed wishes and inconsistent memorandum furnished to him for the purpose of drawing her will, for the testimony of Drs. Quackenboss and Hadden, and her attendant, and of Mr. Merrihew, leave no doubt in my mind that at that time she was not in such mental condition as to render her responsible for what she did, and any expression of desire at that time seems to me entirely without significance in respect to the terms of the will and codicil propounded.

I am therefore of the opinion that upon all subjects, except her relation to George Merrill and wife, and their character and conduct, and the matter of Green & Co., she was of sound and disposing mind when the will and codicil propounded were executed, and that she had capacity to make and execute them if unrestrained.

It seems to me that a careful and proper weighing of the testimony, with reference to the time when the transaction occurred, shows that the decedent at the time

when she executed those instruments had sufficient capacity to comprehend the condition of her property and her relation towards the persons who were or might have been the objects of her bounty, and the scope and bearing of the provisions of her will (Delafield *v.* Parish, 25 *N. Y.*, 9; Van Guysling *v.* Van Kuren, 35 *Id.*, 70; Tyler *v.* Gardiner, *Id.*, 559; Kinne *v.* Johnson, 60 *Barb.*, 69; Meeker *v.* Meeker, 75 *Ill.*, 260; Bundy *v.* McKnight, 48 *Ind.*, 502).

The codicil makes no material change of the provisions of the will, except such as became necessary by reason of the decease of Bishop Bacon, which fact and necessity seem to have been intelligently comprehended by the decedent, and to have been the motive for the execution of the codicil; and hence I am of the opinion that unless the decedent was laboring under an insane delusion or monomania upon the subject of George Merrill's relation to her and his claims upon her bounty, she was of sufficient mental capacity under the authorities to execute the instruments propounded.

Sir JOHN NICOLL, in Dew *v.* Clark (1 *Add.*, 279; 3 *Id.*, 79), well says that no course of harsh treatment, no sudden bursts of violence, no display of unkind and even unnatural feeling merely, can avail in proof of alleged insanity, and it is equally clear that mere eccentricity, however remarkable, does not constitute any certain evidence of insanity.

In Morgan *v.* Boys (*Taylor's Medical Jurisprudence.* 57), testator's will was sustained where it disinherited the heir, or next of kin, directed the executors to cause some parts of his bowels to be converted into fiddle strings, that others should be sublimed into smelling

salts, and that the remainder of his body should be vitrified into lenses for optical purposes, and where in a letter attached, decedent said, "the world might think that it was done in a spirit of singularity or whim, but that he had a mortal aversion to funeral pomp, and wished his body to be converted into purposes useful to mankind," it appearing that decedent conducted his affairs with great shrewdness and ability, and so far from being imbecile, had always been regarded through life as a person of indisputable capacity. Sir HERBERT JENNER held the proof not sufficient to establish insanity, that it amounted to nothing more than eccentricity, and remarked that he did not insist that the mere absurdity and irreverence in the mode of bestowing his own body, as a sacrifice to the interest of science and art, in so bald and awful a mode, was to be regarded as plenary evidence of mental aberration.

In Thompson *v.* Thompson (21 *Barb.*, 107), the decree by Judge BRADFORD admitting the will to probate (2 *Brad.*, 449), was affirmed. Judge MITCHELL, giving the prevailing opinion, says, at page 113 : "Erroneous, foolish, and even absurd opinions on certain subjects, do not show insanity, when the person entertaining them still continues in the possession of his faculties, discreetly conducting not only his own affairs, but the business also of others."

In that case, before the Surrogate, the most extraordinary, absurd and senseless opinions, in reference to matters not connected with the disposition of his property, seem to have been entertained by the decedent for many years, but, for the reasons above stated, he was held to have been of sound and disposing mind.

There seems to be no proof, tending to show the exercise of undue influence upon the decedent in the execution of her will, except that which is to be inferred from the difference in its provisions from those of her former will of 1856 ; and that change is measurably explained by the fact that she had in the meantime become an adherent and member of the Roman Catholic Church, and deeply interested therein, and that she supposed and believed that George Merrill had forfeited all claim to her bounty, and occupied a hostile attitude towards her, personally.

As to the codicil, the only suspicion that can be suggested of undue influence is that Dr. Smith and Dr. Chatard, who were prominent ecclesiastics of the Romish Church, and appeared, particularly the former, to exercise some influence over decedent, were subscribing witnesses, and that the counsel for the principal beneficiary, Cardinal McCloskey, was engaged to formulate the codicil, from the instrument informally executed by decedent and prepared by Dr. Smith ; but Dr. Smith testifies that, so far from exercising influence over the decedent in respect to the terms of the codicil, he urged a recognition of the claims of George Merrill by the decedent, but without effect ; beside, it is clear, from the rough memorandum prepared by the decedent, that she appreciated the propriety and necessity of a codicil, to meet the exigency of Bishop Bacon's decease, and there appears to be no reason why Dr. Chatard and Dr. Smith should desire the property to go to Cardinal McCloskey, instead of to the successor of Bishop Bacon, the suggestion of its going to the latter being rejected by the decedent for personal reasons, doubtless satisfactory to herself, so

that there is only left the suggestion that the codicil finally executed was prepared by Mr. Glover, the attorney for the cardinal, doubtless sent to him for the purpose of being put in legal form, as he was familiar with the laws of this State, and was then temporarily domiciled in Paris.

It may be urged, as a badge of improper interference with decedent's testamentary purpose in making her codicil, that in the memorandum which she prepared in her own handwriting, she referred to the property she had given by will to Dr. Bacon to use as she made known to him, and left it in trust to Dr. McCloskey and Moses Taylor, to be spent in the same way as it would have been by Dr. Bacon had he survived, and referred her trustees to her lawyer, Mr. Glover, for the full particulars of her plans for charity and benevolence ; that, in a memorandum in the handwriting of Dr. Smith, the property was stated to be given and bequeathed to the Most Rev. John McCloskey, Archbishop of New York, and the Rev. Thomas S. Preston, while the instrument dated January 13th, 1875, at the top, and at the bottom 16th of same month, signed by decedent and witnessed by Drs. Chatard and Smith, gave the same to Archbishop McCloskey and the Rev. Mr. Preston, without any suggestion of trust or object of bequest, and which in the codicil propounded bequeaths the same to the cardinal, and in the event of his death before the testatrix, then to the Rev. Thomas S. Preston absolutely.   Still it appears that decedent had possession of the codicil, as finally executed, for several days before its execution, and hence, in the absence of other testimony, may be presumed to have understood the changed provisions and

phraseology. It is to be borne in mind that she had been told, at the time he was preparing her will, by Mr. Glover, that it was difficult to draw a trust for a general charity that would be valid, and the will in its devise to Bishop Bacon was made absolute, and her clear letter of instructions or statement of the object of her bequest, of date November 20th, 1871, addressed to Bishop Bacon, shows that she understood the absolute character of the bequest, and his sole right to dispose of it as he chose; but it is left to conjecture whether she intended to follow the codicil by a letter of instructions as in the case of Bishop Bacon.

The influence or importunity which will avoid a will must be such as to deprive the testator, at the time, of the free exercise of his will, whereby the instrument becomes the will of another mind, rather than that of the testator; such undue influence must have been exercised in respect to the very act, and the act must be proved, and will not be inferred from opportunity and interest (Gardiner v. Gardiner, 34 N. Y., 155; Seguine v. Seguine, 4 Abb. Ct. App. Dec., 191; Kinne v. Johnson, 60 Barb., 69; Cudney v. Cudney, 68 N. Y., 148; Deas v. Wandell, 3 S. C. [T. & C.], 128).

The influence exerted must appear to have amounted to moral coercion, which restrained independent action and destroyed free agency, or have been such an importunity as the testator was unable to resist, and which constrained him to do that which was against his free will and desire (Children's Aid Society v. Loveridge, 70 N. Y., 387).

Where the will is the offspring of an influence brought to bear upon the testator, in any manner, so as to over-

come his free agency, it cannot be sustained by law (*Redf. Am. Cases on the Law of Wills*, 472, note).

No matter how little the influence, if free agency is destroyed, it vitiates the act which is the result of it (Rollwagen *v.* Rollwagen, 63 *N. Y.*, 504, 519 ; *Jarman on Wills*, p. 36).

In Rollwagen *v.* Rollwagen, Judge RAPALLO says : "The undue influence is not often the subject of direct proof. It can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the condition of his health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influence, the opportunity and disposition of the person to wield it, and the acts and declarations of such person," citing many authorities.

In Forman *v.* Smith (7 *Lans.*, 443), MILLER, P. J., says : "Direct proof of undue influence can never or at least rarely be given, and ordinarily it must be established by circumstances and inferences to be drawn from facts and the character of the transaction. . . . It also raises a violent presumption of undue influence where a will executed by an old man differs from his previously expressed intentions, and if it is made in favor of those who stand in confidential relationship to the deceased, which should be overcome by satisfactory testimony" (See, also, Matter of Humphrey, 26 *N. J. Eq.*; 513 ; Sears *v.* Shafer, 6 *N. Y.*, 268 ; Lake *v.* Ranney, 33 *Barb.*, 49 ; Newhouse *v.* Godwin, 17 *Id.*, 236 ; McLaughlin *v.* McDevitt, 63 *N. Y.*, 213 ; Heguenin *v.* Baseley, 14 *Vesey*, 299).

Is there to be any adverse presumption indulged in, in this case, because Drs. Smith and Chatard, Roman

Catholic priests, were present, aided in preparing the codicil, signed as witnesses, and Dr. Chatard forwarded the informal instrument to Mr. Glover for the purpose of having the same put in legal form? It seems to me not, because neither of those persons took any benefit from the codicil, nor is the instrument, in any substantial sense, different from her will or her declared intention, nor can it be strictly said that they stood in such a relation to decedent, as to raise any adverse presumption or suspicion.

In the Marx Will case (4 *Redf.*, 455, 482, 483), I endeavored to lay down a practical and safe line of conduct for a spiritual pastor or teacher in the performance of his duty in such matters ; to which I would add that, if by the earnest presentation of proper arguments, and the enforcement of motives, the intellect shall be persuaded, the conscience quickened and the judgment convinced, not "by constraint, but willingly," such influences are legitimate, and the results praiseworthy, where they do not unreasonably trench upon or violate natural obligations. "Charge them who are rich in this world, that they be ready to give, and glad to distribute," is the expression of a plain pastoral duty, to be enforced not by such importunity as shall dominate the will, but so as to produce "a ready mind." "Let every man do as he is disposed in his heart, not grudgingly, or of necessity." Indeed, it would be a reprehensible invasion of priestly prerogatives to forbid or discourage the earnest and impressive admonition to such an obvious and bounden duty. Upon a careful consideration of the testimony in this case, I am of the opinion that it does not raise a reasonable doubt of the unrestrained execu-

tion of the instruments propounded as decedent's last will and testament, and codicil thereto.

This brings me to the consideration of the third point above stated, and the following dates become material in its consideration:.

Decedent and her husband informally adopted George Merrill about 1838 (he being a nephew of decedent), with the intention of leaving him their property ; and in 1852 decedent and her husband met George at Liverpool, when he was a student at Trinity College, Dublin, where he graduated soon after, and traveled with them in Europe, and sailed for America, they having preceded him, not desiring to risk the lives of all three on the same ship ; prior to which he took, at their request, the name of Merrill, and has borne it since.

In 1854, he went to Newark, New Jersey, to superintend the zinc works. In the latter part of that year, an alarming strike of the workmen occurred, which was soon after communicated to the decedent and her husband, who in January and February thereafter wrote to him upon the subject. The father died May 6, 1867, leaving a will dated November 17, 1856, giving George $30,000, and all in case of decedent dying before her husband ; decedent made a will November 15, 1856, giving all her property to her husband, but in case of his death before her, to George ; George married October, 1862, having been previously rejected, and communicating the fact to decedent, as to which decedent wrote him in February, 1860.

In a letter of January 9, 1845, she addressed him as "My dear George," and closed "Your affectionate mother," in which she stated, if she should not be per-

mitted to see him again, she gave him all her property of every description ; another in the autumn of 1854 was addressed and concluded in the same way, expressing distress about his cold. In a letter of January 6, 1858, she advised him to marry. In one of May, in the same year, she charged him to reserve a certain portion of her property, and after proving her will, to devote it to the settlement of the Green & Co. business, and said that they killed his father, which he declared many times, and that if he hoped to be blessed through life and happy at death, he should scrupulously attend to her wishes to those murderers of his father.

Decedent, in her letter of December 4, 1862, stated that her husband, a few months after he met with George in Liverpool, expressed the opinion *that he was without natural feeling, affection, gratitude, talents, or an appreciation of goodness ; that when he reached Liverpool, he saw him a monster and selfish brute, and from that time he refused to give him his name ; that she had never liked him from the day she met him in Liverpool; that her husband said, when making his will, that she would see him a bad man; that he had all the elements to make a very bad character ;* that since her husband's death she had more closely watched him, and was long ago completely convinced that he was *entirely without principle, truth, natural affection, faith in religion, in fact, every element that made a human being above a brute,* and that she had not discovered in him one element of good, one redeeming quality, and spoke of his marrying a woman who had seduced him—about a lady seeing him off when he left the city, and that Miss Laing was engaged to be married

to him, and that if he married her he would not require
a honeymoon, which implied the necessity of rest after
taking a virgin for a wife, but in his case there would be
no necessity—no exhaustion would follow, but, having
taken her, he must be an uncommonly powerful animal
if she did not put him in a consumption before the anni-
versary of his wedding ; and commented very sharply
upon the conduct of some ladies, who were gathering
presents for him, to be sent while he was at the war ;
magnified, as a serious offense, that she had heard of
Miss Laing's notorious character, and threatened that if
the day came when he called her his wife with the name
of Merrill, he would hear something that he would pray
that the ground would open and swallow him up, and
referred to his sleeping at Mrs. Laing's house over-
night, while engaged to her daughter, and said a mother
would not permit a gentleman so engaged to sleep at her
house if she didn't know her daughter was not a virgin,
and that *it was an invitation to pass the night in bed
with her daughter ;* that she had watched in vain to
find any element of good in him ; that she had not told
the depth of the baseness of his character, which letter
concluded with an imprecation which will be considered
hereafter.

In a letter without date, she reiterated, substantially,
the same charges, and added, among others, that he
would not know the horrors of remorse, as he had no
conscience, being but a wooden man, which also con-
cluded with a malediction which will be hereafter con-
sidered.

These letters, in their statements of fact, appear to
have been deliberately written, as though she fully

believed in their truth ; yet in respect to her deceased husband's alleged dislike of him, and her depreciation of his character, after December, 1852, it may be said that in a letter of decedent's dated January 25, 1855, she expressed her anxiety for ten days at not hearing from him, and her joy in receiving a letter from him, saying that in her maternal feelings she kissed and hugged the letter but could not read a line of it ; that she sent for his father, and when he saw the handwriting, his cheeks seemed to speak his gratitude for his safety ; signed " affectionately your mother."

His father's letter to him of December 26, 1855, addressed him as his "dear son," stated that his letter to his mother had given him great pleasure, that he had acquitted himself with great credit in an emergency, referring to the strike ; he felt confident he would meet such an emergency, and rejoiced that he had not been disappointed, and that few young men situated as he was would have done so; and he added that they were proud of their son, and recommended his passing some time in Washington, and concluded " your own loving father."

In another letter of February 4, 1856, he addresses him as " Dear George," recommending his keeping a horse, and suggesting social amusements, recommending him to engage in the zinc works, and in November following he made his will, in the terms already stated.

On the question of decedent's estimate of George, after seeing him at Liverpool in 1852, and thereafter, the following facts appear :

In her letter of December 25, 1855, she acknowledged the receipt of his lettter, and that she was paralyzed at the thought of his being in a boarding-house,

but rejoiced, on reading further, that he was at the New York Hotel, and chided him for his economy, stating that his father was abundantly able to pay all his bills; expressed her thanks that he mingled in society and made the acquaintance of beautiful and graceful girls, that she thought him a comfort to his father, that he was generally talking about him, and happy when he got a letter, and concluded "with much love, I am your affectionate mother."

Another of February, 1856, expressed her opinion that he would prosper in life, and stated that he was aware of her resolve not to influence him in his choice of his profession or of a wife, the latter of the utmost importance, as the other could be changed; saying that he had worked and thought too much the past year, signed, "Your affectionate mother."

In another of February 4, 1856, she complimented him on the cleverness of his letters, and stated that his father agreed with her; that her husband reproached her for writing sharply to him, and said he was an excellent man and felt very proud of him; signed in the same way. One of March 26, 1857, addressed and concluded in the same way, complimented some poetry he had sent her. One of April 23, 1857, in which she spoke of his father's illness, and his thinking of George coming out in the steamer, and that he should act from his own judgment; that they wouldn't be willing to have him in the same steamer with them, and in a postscript that the doctor had seen him and he was doing better, and that he sent his love and said not to consult any one, for he would barely arrive in time, and they would leave as soon as possible, and it was not to be thought of—his

coming out. One on the 27th of the same month, saying the doctor said his father was better.

Another, the next day, saying that she felt he would see his father again in life, but that he was despondent and expressed a desire to be buried in Greenwood, saying, "We must all lie together," and at a later hour, in a postscript, she stated that the doctor had just seen him, and he was better. May 4, 1857, she wrote that he was no better; that Captain Lynes, of the Arago, had called and could tell him how he was; she believed he would recover so as to go to New York during the summer, and that during his illness he regretted that he had not sent for George, to come in the Arago, the last voyage. Another of the 12th of the same month, stating that his father told her to write to him to come on the Arago, and said : "Tell him to get his trunk quick ; I want to see him. Why did I change my mind about his coming before."

In a postscript of the next morning, she said that his father was alive, but before he got the letter "it is useless, all will soon end, ' Your mother.' "

One of May 14 said his father was very sick, had a great desire to see him, and hoped he would not fail to come out on the Arago, but to direct him not to leave on any ship after the Arago sailed ; she wrote at his request at his bedside, *and that he said he was thinking of him all the time.*

One of May 31, stating that she was about to leave, saying that she had left the Green matter with Mr. Barbe, and asking him, if he stopped in Paris, to see him.

In one of June 1, 1857, addressed and concluded in the same language, she referred to the Green & Co. mat-

ter, and that Mr. Barbe had it in charge, and had paid her expenses for a fortnight past, and done everything for her, giving the items of expense.

One of September 6, 1857, stating that Mrs. Norrie had been to see her and alarmed her much about his health, making anxious inquiries as to it, and stating that his ·father said he would go into a consumption if he didn't marry, and asked him not to trifle away his life, asking him to think how happy he would be if married to a refined, educated, well brought-up girl; that no girl who fancied him could refuse him, and it was only occasionally that a young man could be found with so many recommendations, plenty of money, oldest family, best stock of the country, complete schooling, *thorough cultivation, good talents, high principles, morals of new fallen snow, good presence and disposition to make a woman happy*, and that it was his father's prayer that heaven might give him a good wife.

In a letter of September 21, of same year, she spoke of wishing to see him by himself, and that she *could kiss him fifty times at least*, and asked him not to come to the depot, but call at the Astor House at time stated, and in a postscript she urged him not to meet her, but come to the Astor House.

One of October, 1857, requesting George to engage a berth in the upper cabin of Captain Lynes's steamer for " Mrs. Frost of Portsmouth," decedent's assumed name.

In hers of November 28, 1857, she speaks of Mr. Barbe and his opinion of George,· that he had never met a young man he thought so much of, and was certain he would become very distinguished, and spoke of her advice and training of him; that his love should be given

to his wife, but approval to herself ; that she thought *if he had a son she would worship him*, and repeated that her husband and herself desired him to marry, and stated that his means were sufficient and only needed delay to find the right person.

In hers of December 7, same year, she stated that if he were with her and she indulged her inclination, she would give him many kisses, and asked him in a post-script to be happy, and said she *had but him to love and think of, until he should have a son and call him N. W. Merrill.*

One of date December 18, same year, stated that his letter comforted her, as bringing kind words from him, and suggested again to get married.

One of December 25, 1857, in which she questioned his authority to make investments for her, and his advice in respect thereto, and his arguing with her about business matters, as a disagreeable habit, and that she could not submit to his dictation, and alluded to financial embarrassment, and desire to know the extent of her income ; that she sometimes thought that she should finish her life abroad, but invoked him to remember his father's dying words, " let us lie together," that she wrote to him when the doctor told her his father would die in three days, it would be useless for him to come, and reproached him for having gone to Havre, and for not coming before, and for writing about matters that did not interest her, and about sending her money.

In a letter of January 3, 1858, she reproached him for not writing matters of interest, and suggested he should send half a sheet of paper directed to her, to save postage, giving him advice about the employment of his time, and.

referred to Dr. Harris stating that his fault was want of ambition. In another inclosed without date, she referred to his letters not giving her pleasure to read or him to write. In another she again urged him to marry, and stated that he could never know with what interest *his father looked forward to his grandchildren.*

In a brief note of February 24, 1859, she addressed him as "Mr. George Merrill," and informed him that *if he wished to hold any intercourse with her, he would come to France, and get her signature from Green & Co.'s books, which his hypocrisy caused them to obtain from her,* whereas it appears that he had no agency whatever therein, except in sending a power of attorney to Mr. Barbe and trying to dissuade decedent from the folly of going to Europe, for the purpose of prosecuting the claim.

In a letter of March 2, 1859, she stated she wrote in the bitterness of her soul, that she intended to convey to him the idea that she scorned and despised him, and Mr. Taylor (who had also advised against decedent's going to prosecute the Green claim), and stated she had neither respect or friendship for Barbe, reproached George for putting her in the power of an ignorant Frenchman, and that the first harsh words ever used towards her, were by him, three months after her arrival in New York to bury her husband, and accused him of getting ignorant 'foreigners to help to control and manage her, and that if he had been less in love with himself, he would have learned from her manner that she despised his hypocrisy and self conceit—referred to her settlement of the legacy with him, given by his father's will—that she was annoyed, at her arrival in June, with the remains of her husband, not

to find the vault ready—accused him of neglect to send money to her, which he denied, and she repeated the accusation respecting his going to Havre, instead of remaining in New York, to receive her with his father's remains—*that her feelings towards him were most bitter, and that unless her signature was erased from Green & Co.'s books, which would not have been there but for Barbe not attending to business,* according to Mr. Taylor's advice, she would never hold any intercourse with him whatever—that he should never speak of her as his mother—*that her husband died saying Green & Co. had killed him, and she should die saying that he had killed her.*"

These statements about the unworthiness of Mr. Barbe, were more than a year after she had commended him to George as a fit person to intrust with the Green matter, and whom she had advised him to consult.

Hers, of February 1, 1860, addressed "Dear George," saying that she had been ill and had been tormented with the thought that perhaps he would not carry out her views in regard to Green & Co., but if he promised to do so she *would believe him, as certainly as the day would follow night—she had unwavering faith in his truthfulness, principles and morals,* and alluded to the probability of contesting her will.

In hers of 15th of same month, she stated that she had been thinking, if there was a probability of his marrying, of *having her face painted for her grandson,* and not for him; *that he had " a very pure if not a warm heart,"* for which she was thankful, and "remarkably tender conscience."

Hers of the 21st of the same month stated that, dur-

ing her illness, her desire was to say a few words of kindness to him, to live and to tell him that her seeming hardness was to perfect his character ; speaking about being taken ill by the receipt of a letter from Mr. Barbe, charged with twenty-four sous postage, and asked him to transfer $1,000 from her account to his.

In hers of March 18, same year, she addressed him as "My dear son," and stated that her heart was bursting, not a tear moistened her eye ; charged him, as he valued his soundness of mind, and as he felt the value of health, and love to her, not to dwell upon his rejection, and suggested that Miss Laing belonged to a large class of girls whose sole occupation was to gain admirers, and that she had cause for gratitude that such a girl she was not to have for a daughter, and when she returned to New York she predicted she had read her character from his letter, and asked him to dismiss her from his mind, be strong and manly, and she would be proud of him ; that there had been instances of insanity in her family, caused by disappointed love and grief, and asked him to beware of brooding over his sorrow, to be thankful he was not married, that she felt she was not the woman for him ; she dreaded to receive a letter from him lest his reason had given way, but asked him to make no vow of living for fame, and stated if he desired to come to Europe, she would pay every expense, and closed asking him to "beware of insanity." "Affec tionately, your mother."

One of 20th of same month, stated that she had no thought but for him day and night ; that her dreams of insanity were distressing for him ; implored him not to yield to despondency ; that *there was no happiness in*

*life for her but for him ; that she had made much effort
to keep her senses, sometimes passing weeks not knowing
calm ; walked her room at night, with a prayer on her
lips that her reason might be spared ; that she fancied
his escape would be a blessing ; she had no thought for
her own trials, but his occupied and distressed her, night
and day.*

In hers of March 22, same year, she referred to
receiving a letter from him, and falling upon her knees
and praying for strength to bear any trial it might
bring, and expressed her gratitude that his mind was
firm ; that she went to church especially to pray for him,
and concluding, "Your anxious, unhappy mother."

In hers of April 2, she again charged him to carry
out her views regarding Green & Co., and if she died, to
spend the fortune, if necessary, to accomplish it, but
accused him of being the occasion of all her trouble,
because of intrusting the business to Barbe, and spoke
of his unfeeling conduct in allowing her to cross the
Atlantic in the winter season, when he knew it would be
more than useless.

In one dated February 7, 1861, she addressed him,
"Dear George," and referred to the Green & Co. mat
ter ; that the opinion was expressed that she should pub-
lish a pamphlet of all that had occurred in her interview
with Green & Co., and invoked him to communicate
with different bankers and correspondents of that firm,
asking him to write to different persons, it being her
object to have it known, and tell them how much she
had expended in crossing the ocean on that business
(though she had specially charged him not to mention

the subject to any one, and crossed the ocean once under an assumed name, to conceal it).

One of June 11, of the same year, thanking him for a letter received, saying the step he had taken was overwhelming, invoking God to watch over him and put it in his mind to come back to her, to receive her blessing and forgive her for everything she had said or done to wound his feelings, concluding "affectionately your mother."

Hers of May 5, 1863, made demand upon him for certain articles of property (which he claims had been given to him), which he had no right to.

Another of December 3, 1863, accused him of lying about a worthless bag; that she yielded all her friends to him, didn't visit any that received him, and owned no acquaintance in common; no one could insult her more than by calling upon her if they acknowledged him; that she had never a particle of affection *for him, from the first day she took him to the present, neither had her husband;* had often talked about it, that he was without gratitude; and speaking of Mr. Jones, that she went to the Chemical Bank, and learned for the first time that he (George) had married, and she removed her account to another bank without delay (Mr. Jones being president of the bank).

The decedent appears on numerous occasions, down to nearly the close of her life, after the marriage of George Merrill, to have expressed and often repeated her dislike, distrust and hatred of George, and her imputation against his integrity and purity of character, and that of his wife, and at times, conversing with gentlemen, accused him, in a broad, vulgar and obscene manner and

language, of having had intercourse with his intended wife ; whenever spoken to of him, and his claims upon her, denied that he was "Merrill," but said that he was "Tibbits," and on occasions suggested that if he had married certain persons named, then he would have been "Merrill," and flew into an ungovernable passion, even when her confidential spiritual adviser spoke of him, and repelled the suggestion that he should be a beneficiary under the will ; leaving no rational doubt that she made her will and codicil offered for probate under the impulse of an apparent *insane delusion* as to his character and conduct, and relation to her and claims upon her bounty.

In her letter of December 4, 1862, and another without date, the substance of which has already been given, she concluded : "*I heartily say, may you become as deaf as your sister is, may you become so blind that you cannot distinguish night from day, may you have every trial, every disease, every affliction that was ever sent upon man; may I live to see you hung—hung up by your lying tongue, is my unceasing wish; in conclusion, I give you the curses of her you have called mother for twenty-seven years, and I give you the widow's curses, and I promise you that all I have done for you for a quarter of a century is nothing to the exertion I am now making to have your villainy exposed; the horrors of remorse you cannot have, for you have no conscience —never—never again do you dare to speak of me or of Mr. Merrill.*"

The apparently purposeless mutilation of decedent's will of 1856. It also appears that decedent had a portrait of George, which she mutilated by cutting out mouth and thumb, and she stated the reason for it, *that*

*he had a lying tongue and false pen, and should never be allowed to speak or write again;* and it appears, also, that instead of sending it thus mutilated to George, as evidence of her displeasure, she intrusted it for six years to her relative, Mrs. Salter, wife of Dr. Charles Salter.

This is a very full statement of the facts bearing upon the question of decedent's alleged insane delusion.

If she had taken the notion that George had become indifferent to her wishes, and rebellious against her authority, however unreasonable and untrue, it might have been said that there was some semblance of fact and circumstances to base the suspicion upon, in his marriage against her will, which an imperious disposition and over-jealous nature might have magnified into an unpardonable offense; but her extravagant and irrational exaggeration of his so-called offense, her apparently sincere imputation of an unworthy and depraved character, of his reprehensible, impure and immoral conduct, her baseless accusation of unworthiness and wickedness and impurity on the part of George and his estimable and accomplished wife, her utterly false and irrational statement that his adopted father from his visit to Liverpool, which appears to have been about 1852, discovered his innate depravity, and thereafter distrusted and disliked him, and refused him his name, and her alleged discovery of his baseness and subsequent dislike of him, all entirely and overwhelmingly disproved by numerous subsequent letters, full of extravagant expressions of confidence in his ability, education, moral purity, and her great pride in his talents and brilliant prospects; her extraordinary expressions of solicitude for his advancement, and especially for his safety in

respect to the strike at the zinc works, and her anxiety lest his mind should be dethroned by his rejection ; by the frequent conversation with different persons as to their estimate of and affection for him, years after the event which was stated by her as the beginning of their distrust, and especially by the terms of both of their wills, made and executed in 1856, four years after the time mentioned, wherein he was made the ultimate beneficiary by name, as their adopted son, and many other circumstances, which might be recalled.

Taken in conjunction with the foregoing facts and circumstances, her vulgar and false charge, without the remotest foundation, of illicit intercourse between George and his intended wife, the general imputation of unchastity, equally baseless, her diabolical and fiendish imprecations upon George, just referred to, her incoherent and impious curses, her senseless mutilation of her will and his portrait, and the reasons given for it, all combine to show that, if decedent was of sound mind, an intelligent, affectionate, kind, modest, truthful, Christian woman had been transformed into a bold, defiant, passionate, unfeeling, cruel, false, vulgar and obscene fiend incarnate, which cannot be pleaded even as a thoughtless ebullition of intemperate, ungovernable anger and jealousy, for the utterances were oft repeated and rewritten with deliberation at distances from the object of her malediction, with nothing apparently but a distorted brain to account for her transformation so complete and the delusions so marked, which would be a signal mercy to her memory and the fame of her sex, to ascribe it to a *morbid or insane delusion.*

It is of the essence of an *insane delusion,* that as it has

no basis in reason, so it cannot by reason be dispersed. and is thus capable of being cherished side by side with other ideas with which it is rationally inconsistent (Smith *v.* Tebbitt, 16 *Weekly Rep.*, 18).

An insane delusion is not only one which is founded in error, but one in favor of the truth of which there is no evidence, but the clearest evidence often to the contrary. It must be a delusion of such a character that no evidence or argument will have the slightest effect to remove (1 *Redf. Law of Wills*, 86 ; Florey *v.* Florey, 24 *Ala.*, 241).

In Stanton *v.* Wetherwax (16 *Barb.*, 259), Judge GRIDLEY approves Sir JOHN NICOLLS' definition of insane delusion, as follows : "Whenever the patient once conceives something extravagant to exist, which has still no existence whatever but in his own heated imagination, and whenever, at the same time, having once so conceived, he is incapable of being, or at least of being permanently reasoned out of that conception, such a patient is said to be under a delusion, in a peculiar, half technical sense of the term, and the absence or presence of delusion so understood forms in my judgment the only true test or criterion of absent or present insanity." See 1 *Bouvier Dict.*, "Delusion," and cases cited.

In Clapp *v.* Fullerton (34 *N. Y.*, 190), it was held not sufficient to justify the rejection of a will, that a testator, in other respects competent, entertained the mistaken idea that one of his daughters was illegitimate, if it was not the effect of insane delusion, but of slight and inadequate evidence acting upon a jealous and suspicious mind ; and Judge REDFIELD, in his treatise, at vol. 1, p. 86, note 22, says that " this is placing the question upon safe ground,

as a belief, based upon evidence, however slight, is not delusion, which rests on no evidence, but upon mere surmise.''

In Seamen's Friend Society *v.* Hopper (33 *N. Y.*, 619), it was held that a person persistently believing supposed facts, which had no real existence, against all evidence and probability, and conducting himself upon the assumption of their existence, was, so far as such facts were concerned, under an insane delusion.

The whole character, deportment and conduct of George Merrill has been conclusively proved to have been a complete refutation of decedent's accusations, which accusations, however, appear to have been confidently believed by her, for it would be an unjust and unwarranted accusation that she knew them to be untrue and yet persisted in charging and acting upon their truth.

Her belief that the Green & Co. matter had killed her husband, and that he said so repeatedly, is against reason, and contradicted by all the probabilities of the case, and the whole character of her husband afforded the most persuasive evidence against the assertion. The education, manners, culture, habits, talents, morals, generous, honorable and manly instincts of George Merrill contradicted all her slanderous and libelous charges against him, and the verbal and written opinions of her husband, and of herself, furnish the most indubitable ref- utation of her allegations; that neither his adopted father or she ever felt any interest, confidence or affection for him, and in her case, her unvarying statements in her correspondence of about eight years after George had graduated, afford positive proof that she often stated and wrote most obvious falsehoods respecting him, and of her

opinion of and sentiments towards him, so that she believed the untruths, *not only without evidence, but against the cogent arguments which the facts afforded.*

Another feature which it seems to me should have some weight in this inquiry, is that the prejudices, jealousy, vindictiveness and vulgarity of the decedent, did not exhibit themselves as connected with any other matter than her relations to George, his wife, and the Green & Co. matter, and it seems perfectly obvious that the decedent was possessed of a morbid mind upon those subjects, from which there is no evidence that she ever recovered ; but on the contrary, whenever her mind rested upon those subjects, a morbid delusion exhibited itself ; and I am of the opinion that she entertained them until the execution of her will and codicil propounded, and they constituted the motive and occasion of her change of the terms of her will of 1856, and the disinherison of George.

This brings me to the inquiry whether the insane delusions in respect to George were such as to avoid the will and codicil. Redfield, in his first volume, at page 79, states the rule thus: "Whenever it appears that the will is the direct offspring of partial insanity, or monomania, under which the testator was laboring, it should be regarded as invalid, though his general capacity be unimpeached" (Boyd *v.* Eby, 8 *Watts*, 71 ; Tawney *v.* Long, 76 *Penn.*, 106 ; Dew *v.* Clark, 1 *Add.*, 279 ; 3 *Id.*, 79).

*Willard on Executors*, at page 8, says, of the latter case, it must be considered as establishing the doctrine that partial insanity will invalidate a will which is fairly inferred to be the direct offspring of that insanity.

In Waters v. Cullen (2 *Bradf.*, 354), the will was set aside on the ground of insanity, the testatrix having died of *delirium tremens*, to which she had been subject more or less, for some time before her death ; she gave her property to the children of her first husband, and left those by the last penniless, stating, as the reason, that the property came from her first husband ; it also appeared that she believed that she had been poisoned by the father of the children whom she left unprovided for, and it was held that she labored under an insane delusion in both respects. In Stanton v. Wetherwax, above cited, the same doctrine is maintained. See also Seamen's Friend Society v. Hopper, above cited.

In Lathrop v. American Board of Foreign Missions (67 *Barb.*, 590), the decree of the Surrogate, refusing probate of the instrument propounded on the ground that it was executed under the delusion that his relatives and acquaintances had entered into a conspiracy to rob him of his property, he being a confirmed monomaniac upon the subject of freemasons, and charging that his relatives were freemasons, was affirmed.

In Lathrop v. Borden (5 *Hun*, 560), the same doctrine is maintained ; also in Clapp v. Fullerton, above cited (see also Brick v. Brick, 66 *N. Y.*, 144 ; Coit v. Patchen, 77 *Id.*, 533 ; Denson v. Beazley, 34 *Texas*, 191).

In Gardner v. Lamback (47 *Ga.*, 133), the charge to the jury, that if the testator was partially insane, and the will was in any way the effect or result of that insanity, it was void, was sustained.

In Potts v. House (6 *Ga.*, 324), it was held that if the testator was partially deranged, either as to the legatee or subject matter of his will, he was mentally unsound

in respect to the particular will, however unimpeachable his capacity in other respects. (See Lucas *v.* Parsons, 24 *Id.*, 640 ; Brooke *v.* Townshend, 7 *Gill*, 10 ; Robinson *v.* Adams, 62 *Maine*, 369 ; Benoist *v.* Murrin, 58 *Mo.*, 307 ; Stackhouse *v.* Horton, 15 *N. J. Eq.*, 202.)

If the argument of the learned counsel for the residuary legatee in this proceeding was rightly apprehended upon this branch of the case, it was that George Merrill had no claims upon the testatrix's bounty, and therefore any insane delusion as to him would not invalidate the instrument propounded.

Upon the most careful consideration which I have been able to give the elementary treatises and decisions upon the subject, I am not able to find any such distinction enforced or recognized. The fact that George was next of kin of decedent, who would have taken a share of her property in case of intestacy, and had been informally adopted by decedent's husband and recognized by him and the decedent as a son, with the declared intention that he should succeed to their property, and the execution of decedent's will of 1856, by which George became the sole beneficiary, seem to me to establish a claim on the bounty of decedent which cannot be denied, for as next of kin, in the absence of a will, he had a claim upon her bounty, and that claim certainly was not weakened by adoption and treatment as a son, and it is too clear for argument that if the instruments propounded are void for want of mental capacity on the part of the decedent to execute them, then at her death, notwithstanding the execution of them, George became the vested owner of all her property.

Suppose that the decedent, after the execution of her

will of 1856, had been informed by one of her other relatives that George had died, and in the honest belief of that fact, she made a new will, giving all her property to that relative who had thus deceived her, would there be any doubt that George, by virtue of the former will, had such claims upon the decedent as to entitle him to contest the later will, and to allege that it was made under fraudulent representations, and therefore void, and that fact being established, is it not manifest that it would revive the former will, and thus vest in the contestant all his rights ?*

Indeed, I am inclined to the opinion that if George had been an entire stranger to the decedent, and under an insane delusion she had changed her will, which had given him her property, to his disinherison, that insane delusion would avoid the latter instrument and revive the former.

I am not able to understand why a will made by an insane person should be invalidated, when it deprives a near relative of an expected bounty, and *validated*, when it deprives a remote relative of a like bounty, for it is the *insanity* which avoids the act, and if the will clearly appears to have been executed under an *insane delusion*, it would be equally void as if executed by one who was a confirmed lunatic or utterly demented, and George, if a stranger, could contest the will thus made, because of his rights under the former will.

See Walsh v. Ryan (1 *Brad.*, 433), where it was held that it was competent for a legatee under a will to oppose

---

* Subsequently to this decision, an action was brought, in the supreme court, to establish the will of 1856, and a judgment recovered in plaintiff's favor, in 1882.

the proof of a codicil, which purported to revoke his legacy given by the will.

In Gombault v. Public Administrator (4 *Brad.*, 226), it was held that the public administrator might intervene to contest the probate of a will as to the personal estate, and the attorney-general as to the realty.

I can conceive no logic which would validate a will executed as the offspring of an *insane delusion*, and the only significance that the relationship of the parties contesting, as the subject of the insane delusion, can have, is in determining whether the will was the offspring of the particular delusion alleged.

I am fully aware of the fact that the setting aside or rejection of a will is the exercise of a very radical judicial prerogative, and that it should not be exercised except upon very satisfactory proofs. But if I am right in holding that decedent made the will and codicil offered for probate, under a delusion as to the character and conduct of George Merrill, and that delusion was such as the law adjudges *insane, the will and codicil must be refused probate.* This latter conclusion renders it unnecessary to consider the point raised as to the provisions in behalf of Cardinal McCloskey, being in fact in trust for the benefit of "religious or missionary societies or corporations."

The instruments propounded should be refused probate because they were executed by the decedent when laboring under an *insane delusion*, the same being the direct offspring of such delusion.

Let a decree be entered accordingly.